REXFORD v. SOUTHERN WOODLAND CO. et al.

(District Court, D. South Carolina, at Charleston. November 3, 1913.)

1. VENDOR AND PURCHASER (§ 54*)—EXECUTORY CONTRACT—EFFECT.

A vendor, who has made an executory contract based on a valuable consideration to convey land on the payment of the purchase price, is regarded in equity as holding the legal title in trust, first, to secure the payment of the price, and, second, to convey to the purchaser.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. § 85; Dec. Dig. § 54.*]

2. SPECIFIC PERFORMANCE (§ 3*)—RIGHT TO RELIEF—REMEDY.

Specific performance is awarded when one party to a contract for the sale of land refuses to perform and the other party is not in default.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 3, 3½; Dec. Dig. § 3.*]

3. SPECIFIC PERFORMANCE (§ 8*)—RIGHT TO RELIEF—DISCRETION.

A vendee's right to specific performance of a contract for the sale of land is not absolute, but the granting of such relief is a matter of sound judicial discretion to be controlled by established principles of equity and exercised on a consideration of all the circumstances of each particular case.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 17, 18; Dec. Dig. § 8.*]

4. SPECIFIC PERFORMANCE (§ 99*)—VENDEE IN DEFAULT—RIGHT TO RELIEF.

A contract for the sale of timber land and timber rights, while in form a bilateral contract, was in fact, so far as its enforcement by legal proceedings was concerned, a mere option. It provided for prompt payment of one-third of the purchase price on September 9, 1907, and the balance in two equal annual installments; the vendee also agreeing to pay the taxes for the current year. The vendee had no means, having been discharged in bankruptcy in the spring of that year, which fact was not known to the vendors when they made the contract. There was no evidence that the vendee took or expected to take possession of the land. He failed to pay the taxes, and on the maturity of the September installment of the price procured an extension, giving notes therefor which were renewed and which were not paid, and the vendors subsequently sold parts of the land to others. *Held*, that the vendee was in default and was not entitled to specific performance.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 299-304; Dec. Dig. § 99.*]

5. VENDOR AND PURCHASER (§ 102*)—CONTRACT—ENFORCEMENT—TERMINATION —VENDEE'S DEFAULT—RETURN OF PAYMENTS.

Where, on a vendee's default in payment of one-third of the purchase price, the vendors elected to consider the contract at an end, and in a suit for specific performance pleaded the default in defense without asking any affirmative relief, there was no question of rescission within the rule

that a party seeking to rescind a contract must restore to the other party the amount received by him in part performance or on account thereof.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 175–177; Dec. Dig. § 102.*]

6. VENDOR AND PURCHASER (§ 148*)—CONTRACT—CONSTRUCTION—DEED—DUTY TO DELIVER.

Where a contract for the sale of land obligated the vendors to deliver a deed on payment of one-third of the price, falling due 90 days from the date of the contract, and the vendors, at the vendee's request, extended the time for the payment of that sum, such extension also extended the time for the delivery of the deed, and they were therefore not in default in failing to tender a deed prior to the payment of such installment.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 290–295; Dec. Dig. § 148.*]

7. LOGS AND LOGGING (§ 2*) — CONTRACT OF SALE — CONSTRUCTION — DUTY TO SURVEY.

Where a contract for the sale of timber land and timber rights provided that the number of acres in each tract were stated with either a reference to a survey or other description, and the vendee requested various extensions of the time for payment of the one-third of the purchase price, which was due September 11, 1907, without making any demand for a survey, the vendors were not bound to have the land surveyed and the exact number of acres ascertained before they were entitled to call for payment of such portion of the price.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. §§ 1–5; Dec. Dig. § 2.*]

8. VENDOR AND PURCHASER (§ 98*)—VENDEE'S DEFAULT—TERMINATION OF CONTRACT—RETENTION OF NOTES.

The vendors having received the vendee's notes for one-third of the purchase price, on his inability to pay the same as required by the contract, negotiated the same to certain banks, and were subsequently compelled to take them up, whereupon the contract was forfeited because of the vendee's default. The vendee's attorney was informed that the vendors did not consider the notes of any value and were ready to surrender them, and there was no proposition made at the time to pay the balance due on the contract in order to save the vendee's rights. *Held*, that the vendors' retention of the notes did not negative their intention to terminate the contract.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 163–165; Dec. Dig. § 98.*]

9. EQUITY (§ 427*)—PRAYER—GENERAL RELIEF—SCOPE.

Under a prayer for general relief in a bill, the court will consider every phase of the testimony and award such relief as the complainant is entitled to.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 1001–1014; Dec. Dig. § 427.*]

10. SPECIFIC PERFORMANCE (§ 128*)—VENDEE'S DEFAULT—MONEY PAID—RIGHT TO RECOVERY.

Complainant purchased certain timber land and timber rights for $277,-062.50, on two-thirds of which interest was to be computed from September 11, 1907, payable annually. Complainant was in default in failing to pay the one-third of the price, but, assuming that he had complied with his contract on May 13, 1908, the due date of the last extension, the interest then due would have closely approximated the amount due by him. *Held*, that he was not entitled to recover any part of the sum so paid on the vendors declaring the contract at an end.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 412–419; Dec. Dig. § 128.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Bill by W. A. Rexford against the Southern Woodland Company and others, for specific performance of a contract for the sale of land. Bill dismissed.

Lee & Ford and James H. Merrimon, all of Asheville, N. C., and McCullough, Martin & Blythe, of Greenville, S. C., for complainant.
Mitchell & Smith, of Charleston, S. C., for defendants.

CONNOR, District Judge. The cause was heard upon the testimony taken by John P. Arthur, Esq., special examiner. It appears, from the pleadings, that defendants Southern Woodland Company, a South Carolina corporation, and R. P. Tucker, a citizen of Charleston, S. C., on June 11, 1907, entered into a contract with complainant, W. A. Rexford, a citizen of Asheville, N. C., whereby they contracted to sell and convey to him 55,412 acres of land, 19,290 acres of which is situate in Oconee county, S. C., and the remainder in White and Habersham counties, Ga., at the price of $5 per acre. The land is described in the contract as "certain tracts of land in fee, and also the timber and rights on other lands." The contract provides:

"That the party of the second part, in consideration of the covenants and agreements made by the parties of the first part, hereby agrees to bind himself to purchase from the said parties of the first part all of the timber and timber rights and privileges hereinbefore described, at and for the sum of five dollars per acre for the entire acreage, whether in fee or in timber and rights payable as follows: Twenty-five hundred dollars cash; twenty-five hundred dollars thirty days from the date hereof; one-third of the balance of the purchase price ninety (90) days from the date thereof and the balance of said purchase price in two equal annual installments, with interest thereon at the rate of six per cent. per annum, payable annually, said two last deferred payments to be secured by a mortgage on the property hereby agreed to be conveyed, and said deed to be delivered on the payment of the amount falling due hereunder ninety days from date thereof; all payments to be at the office of R. P. Tucker, Charleston, S. C."

The taxes, for the current year, were to be paid by complainant. He paid on account of the purchase price, on June 7, 1907, $2,500, and, on July 10, 1907, $2,500. He alleges that, upon the execution of the contract, he went into possession of the land; this is denied by defendants. The testimony shows that, prior to September 7, 1907, upon the request of complainant, defendants extended the time, and complainant agreed to pay, on September 11, 1907, $10,000 cash, and the balance on January 1, 1908, "at which time the balance of said payment falling due September 9th, shall be paid, and the transfer of the property made in accordance with the terms of the said contract. This extension of time is, however, made on the distinct understanding that interest at the rate of six per cent. (6%) per annum, on the unpaid portion of the purchase money, is to commence to run from September 9, 1907." Complainant, on September 11, 1907, paid the $10,000 according to the agreement.

Complainant, December 19, 1907, asked for a further extension, saying:

"I will close promptly for the property at the end of 60 days, perhaps sooner."

Defendant R. P. Tucker wired complainant:

"Strongly advise your coming to Charleston for conference with my associates and self. From assurances in September, we considered payment first of January a certainty and committed ourselves accordingly. Wire time arrival quick."

Further extension was granted, and complainant, on December 30, 1907, executed seven promissory notes for $10,000 each, and one for $7,000, due and payable March 18, 1908, being the balance of the one-third of the purchase price. Defendants executed their receipt for said amount and notes, containing the following language:

"Which, when paid, shall be credited to the extent of payment upon the amount now due under the contract made 11 June, 1907, between Southern Woodland Co. and R. P. Tucker and W. A. Rexford. If said notes are not paid, then said contract shall remain, in all respects, as if said notes had not been given."

Complainant, March 9, 1908, wired R. P. Tucker:

"Get bank to extend my note sixty days. I will send check to pay interest."

Tucker replied:

"Banks refuse to extend for full amount. Can probably arrange with them to carry part. Answer quick if you desire me to act, as they must be seen without delay."

Complainant wired:

"Five thousand now. Five thousand thirty days—balance sixty days, best I can do."

Tucker wired, March 10th, that he had seen banks and they had consented to extend "ten thousand now, ten thousand thirty days, balance sixty days—wire immediately to close such an arrangement, as I have only verbal consent." Same day complainant wired:

"Expect to pay all in thirty days. Best can promise is five thousand now, five thousand in thirty days, balance sixty."

Tucker, March 11th, wired:

"I am ready and willing to do all I can for you in the matter, but must have your full co-operation and must request that you exert yourself to utmost limit. Banks will not consider your proposition. Wire me quick another, as near as possible to one I prevailed on them to accept."

Same day complainant wired, from Elmira, N. Y.:

"Here bedside sick father, is why obliged to ask extension. Can fix as soon as can leave. Can't promise more if obliged to sacrifice all."

Tucker wired:

"Have submitted your last telegram to banks. In consideration of father's illness they consent to renew as per your former wire—vizibly five thousand now, five thousand thirty days, balance sixty days. Send New York Exchange immediately. Wire when mailed."

Tucker wired, March 16th:

"Referring to my last telegram, remember notes fall due on the eighteenth, including three days grace. Necessary for remittance to be here then."

Same day complainant wired:

"Sent check Saturday. You should have received this morning if not then, answer."

Tucker wrote, March 16th, acknowledging receipt of check for $5,-000, and saying:

"I will pay this amount on your outstanding notes as agreed and have arranged with the two banks holding said notes to renew for the balance in accordance with your telegram."

He inclosed notes for signature, asking complainant to sign and return with check for $1,014.09 interest due, concluding:

"I do not think you realize just how hard it is for me to arrange this matter for you, but I am very glad that I have been able to do so."

The notes were signed and returned March 19th; complainant said that he was not able to pay the interest at that time, and thanked Tucker for the kindness shown him.

Complainant wrote, April 16th, Exchange Banking & Trust Co., Charleston, S. C., asking for an extension to the 25th of April, saying:

"Will surely have money ready for you by the above-named time."

Bank replied, by telegram, granting extension, saying:

"Must be met then."

On April 20th, it wrote, confirming wire, saying:

"We shall expect payment at that time."

Bank wired April 27th:

"At your request, and on your positive assurance, we arrange to hold your paper until April 25th. Have you made remittance to cover? Answer quick."

Complainant wired:

"Arranging for money certainly have it to you a few days."

Tucker wired, April 29th:

"Bank calling me to make good your paper due April 18th. Have you remitted, if not, please remit immediately. Answer definitely quick."

Complainant wired, April 30th, from Williamsport, N. Y.:

"Have arranged for money. Will certainly remit Saturday. See letter."

Complainant wrote May 1st, from Baltimore:

"Will mail you check so you will get same Monday." Expresses regret at delay.

Tucker wired, May 5th:

"Promised remittance not received. Please wire definitely and finally, quick."

Complainant answered:

"Absolutely failed to get money as promised. Have it promised this week. Certainly doing my best."

Tucker wired, May 7th:

"Pressing business demands my leaving here this week. Can not do so until your matter fixed. Must have positive date remittance from you."

Same day complainant wired:

"Get note extended few days until I can raise money."

Tucker wired:

"Telegram not clear. Am I to understand you request note extended until end of week during which time you will certainly remit. Answer quick."

Complainant wired, May 7th:

"Disappointed again in getting money. You must get note extended thirty days."

He wired, May 13th:

"Can you get bank to hold notes as they are until I can get there Saturday?"

Tucker wired, July 11th:

"Please answer immediately my telegram, July eighth."

Tucker wired, July 13th:

"Absolutely necessary to have definite assurance of immediate payment of past due amounts. Answer quick, naming day this week for settlement."

Complainant wired, July 20th:

"Will pay you August second for nineteen thousand acres—one third cash, balance one, two, three years, bankable paper, trying to make it all cash."

Tucker wired, July 20th:

"Telegram received. Absolutely necessary for us to have conference immediately. Wire quick what day next week you can be here."

Complainant wired, July 27th:

"Deal will certainly be closed up as per telegram—will notify you later what day we will meet for settlement."

Tucker wired, August 4th:

"Have heard nothing since telegram twenty-seventh which indicated you would see me by August second. Answer quick, giving definite information."

. Tucker wired August 11th:

"Please wire me immediately and definitely what you propose doing."

No answer was received to this telegram. Tucker wrote, November 28th, S. T. Graves, who negotiated the original contract, and to whom the abstracts of title and books of plats had been loaned, referring to negotiation with Janes, and asking that they be returned. Complainant, to whom Graves sent this letter, wrote Tucker, January 4, 1909:

"As by your request to Mr. Graves, who is now in Richmond, Va., for him to send to you abstracts and plats of Georgia lands, will say that I am sending you by express to-day prepaid the books of abstracts and the blueprint of the Georgia lands. The book of plats is in Elmira, New York. I have ordered it shipped here and should you think you will need it, I shall ship it to you on request. Hoping that the delay in this matter caused by the absence of Mr. Graves will not cause you any inconvenience, etc."

Tucker acknowledged, January 6, 1909, the receipt of letter and express receipts for plats, saying:

"I beg to thank you for forwarding to me the abstracts to our White Co. Georgia and Oconee county, S. C. properties which were in possession of Mr. Graves and request that you forward the prints as soon after their arrival at Asheville as possible."

Complainant and defendants had no further communication or correspondence.

Mr. J. H. Tucker, an attorney residing in Asheville, N. C., as the representative of complainant, went to Charleston, S. C., January 16, 1909, for the purpose of seeing defendant Mr. R. P. Tucker. He says:

"I informed him that I was the attorney for W. A. Rexford, the plaintiff in this cause, and desired a settlement of matter between them concerning the purchase of the lands in question in this action; the contract concerning same and matters therewith connected. Mr. Tucker was very bitter, and positively informed me that, as attorney for Rexford, he declined to recognize me for any purpose; that he declined to recognize any right that Mr. Rexford had in the premises, and that he declined to discuss the matter with me. This was his most positive declaration. Afterwards, however, he spoke of what he considered the bad treatment he had received from Mr. Rexford concerning this transaction. Said that he did not consider Mr. Rexford had complied with his contract."

Mr. James H. Tucker was asked:

"Did you go over, on that date, to Mr. R. P. Tucker's office prepared to make a settlement?"

He answered:

"Having been informed that Janes and Byrd were there to close the deal out, at $6.50 per acre, for the land, I went there in the light of that information, prepared to enter negotiations for a settlement of their matters upon that basis."

Defendant R. P. Tucker, in regard to this conversation, says:

"In a general way, he stated to me that he had come down on behalf of his client, Mr. Rexford, and that he thought Mr. Rexford was entitled to some consideration. I stated to Mr. Tucker that I considered the contract between Mr. Rexford and myself null and void and had considered it so for many months past, due to the fact that Mr. Rexford had violated many of the terms of said contract. I stated to him that I did not consider Rexford's notes worth two cents, and that they had always been subject to Rexford's order and that I had always been, and was, prepared to deliver them to Mr. Rexford in person or to any one upon an order from Mr. Rexford so to do."

No further communication was had between complainant, or any one representing him, and R. P. Tucker. Complainant was represented to Tucker, by Graves, as a man of means. "Invariably lived up to his contracts." He had received his discharge in bankruptcy during the spring of 1907. On January 16, 1909, defendants sold the portion of the lands embraced in the contract, situate in Georgia, to Byrd and Janes at the price of $6.50 per acre, and on November 13, 1909, they sold the portion situate in South Carolina to defendant Oconee Lumber Company at the same price. Complainant, in his bill filed April 28, 1910, alleges that the purchasers took title to the lands conveyed to them with notice of his equities, etc. He alleges that on January 16, 1909, he demanded a settlement of defendants, and "if anything was due them on account of his contract of purchase, he was ready, willing, and able to pay such balance and discharge all obligations resting upon him, including any indebtedness that he might owe defendants, etc."; that defendants refused to comply with this demand or "to settle, or negotiate a settlement under the said contract, or otherwise,

claiming that the plaintiff had forfeited all rights under the contract, etc." He demands judgment:

"1. For $100,000.

"2. For an accounting, etc.

"3. That defendants; and each of them, be decreed to hold the title to said land and any timber thereon, or removed therefrom, in trust for complainant and to account therefor.

"4. For other and further relief," etc.

Process was served on defendants, Southern Woodland Company, R. P. Tucker, and the Oconee Timber Company. The defendants Southern Woodland Company and R. P. Tucker filed a joint answer. Defendant Oconee Timber Company filed a separate answer, averring that, on November 13, 1909, it purchased a portion of the lands in controversy situate in Oconee county, S. C., for a full and valuable consideration, without any notice of complainant's alleged equities, etc. This answer is verified by R. P. Tucker, secretary and treasurer of defendant company. No process was served upon J. H. Byrd or H. S. Janes, and no appearance made, or answer filed, by them.

Defendants Southern Woodland Company and R. P. Tucker say, in regard to the prayer of complainant for surrender and cancellation of his notes, that, at all times since the failure to pay them upon the last date agreed upon, they have been held subject to the order of complainant to be delivered to him, or any representative of his, whenever requested, and have never been used, or attempted to be used, in any way, by them, and "they are now ready to be delivered to complainant when requested, and these defendants herewith file the said notes in this honorable court, together with this answer to be treated and dealt with by this court as it sees fit." The answer contains full and specific denials of the material averments of the bill. There is a phase of the controversy in regard to which the evidence is, to a large extent, oral and not so clear as could be desired. Complainant avers, in his bill:

"That it was understood and agreed, at the time the contract was entered into, that he should have the right to sell any or all of the property to a purchaser, acceptable to defendants, and upon terms satisfactory to them, on account of his obligation to purchase, that title would be made to such purchasers, and that, on the 16th day of January, 1901, plaintiff did procure a purchaser for certain of the said lands and timber rights as set forth in the agreement of that date, a copy of which is hereto attached, and marked 'Exhibit B,' and made a part of this complaint, the said sale being made to the defendant, J. H. Byrd and H. S. Janes, to whom plaintiff and his agent, S. T. Graves. introduced the said R. P. Tucker, and plaintiff is informed and believes that the said defendants did purchase the said lands described in the said agreement on plaintiff's account, and that they have paid to the said R. P. Tucker and Southern Woodland Company several thousand dollars, the exact amount plaintiff does not know."

That on the 16th of January, 1909, complainant demanded a settlement. Exhibit B, attached to bill, purports to be a copy of a contract made between R. P. Tucker, of the first part, and J. H. Byrd and H. S. Janes, of the second part, dated January 16, 1909, whereby the first-named party agrees to sell, and the second to buy, that portion of the land in controversy, situate in the state of Georgia. Defend-

ants Southern Woodland Company and R. P. Tucker deny that there was any agreement by which complainant was authorized to sell any portion of the lands until he had paid the purchase money therefor. They admit that he would have been entitled to sell any rights which he had under the terms of said contract, subject to the rights of defendants. They deny that, on the 16th day of January, 1909, or on any other date, complainant procured a purchaser for any of the lands or timber rights. They deny that defendant R. P. Tucker was introduced to his codefendants Byrd and Janes by complainant, or his agent, or that said parties purchased the lands referred to in Exhibit B on account of complainant; but, on the contrary, they aver that the purchase was made long after complainant, by his failure to comply with his contract and after defendants had notified him that they would treat the property as their own.

The evidence in regard to this phase of the case is, to a large extent, that of S. T. Graves and R. P. Tucker. Complainant appears to have had but little knowledge in regard to it. It seems that, after negotiating the contract of June 11, 1907, between complainant and defendants Southern Woodland Company and R. P. Tucker, S. T. Graves acted as "the friend and agent" of complainant. He endeavored to find a purchaser for the lands. He says that some time during the month of February, 1908, he took a trip over the lands with Mr. Marsh and Mr. Janes, for the purpose of trying to sell to them; that he told Mr. Marsh that he wanted to "act as quickly as possible, as our time was getting short and we would probably get in danger if we did not act quickly, that I was in a hurry for the sale to be made." This was on second trip March or April, 1908. He quoted the land to them at $6.50 an acre; they raised no objection at that time, although it does not appear that any definite proposition to sell was made. That during this time he kept "in touch" with Mr. Rexford. He made a trip to Charleston, S. C., to see Mr. Tucker. He "went there to see Mr. Tucker in the interest of getting the contract extended." Thinks this was May 11, 1908. He is asked:

"Did you inform him of the negotiation with reference to the purchase of the property?"

Answering, he said:

"That matter may have been discussed. The thing we discussed most was extending the time of contract—the contract with Mr. Rexford."

Referring to the negotiation with Mr. Marsh and Mr. Janes, he says:

"There was a good deal of doubt, and I had a letter from Mr. Tucker, expressing his doubt about the matter. * * * There was nothing definite. I made a payment of $1,000, think it was on May 11, 1908," got the money from R. B. Henley and associates of Richmond, Va., "on an option on the King property. * * * They gave me a check for $1,000, and I took that check and turned it over to Mr. Tucker. * * * Told him where I got it. I did not tell him how to apply it, supposed it was to go as a credit on Mr. Rexford's indebtedness, am not sure of it, but think so. He made no objection to receiving it on Mr. Rexford's indebtedness. May have seen Tucker two or three times—discussed the negotiations with Byrd and Janes."

He says that he met R. P. Tucker in Baltimore in June, 1908, and introduced him to Janes. In this conversation, Mr. Tucker said:

"I believe I have told you before, Col. Rexford has nothing to do with this deal—that he is down and out, and if you expect to have anything to do with this deal it will have to be done through me. Mr. Rexford has forfeited his contract and it will have to be done through me."

He did not go with them on the land after that.

On cross-examination Graves says that after the conversation in Baltimore, June, 1908, he felt free to enter into a contract with Mr. Tucker to sell the land on a commission. "I did all I could to sell the property after that." He says that Mr. Rexford wired him to go to see Mr. Tucker to try to get an extension. Tucker said, "I have been sweating blood and I don't believe I can," but would communicate with us, thinks this was in May. "Mr. Tucker refused to grant the time, and I notified Col. Rexford. And I also notified him immediately when this happened in Baltimore." Referring to the conversation in Charleston, on May 11, 1908, he says:

"I could get no extension because I was not in a position to make the payments. It was then that Mr. Tucker told me that Col. Rexford had not complied with his contract; that if something was not done, and done at once, or words to that effect, that Mr. Rexford would be down and out; that he had sweated blood over this thing, but he was not going to do it any longer; and asked me about Col. Rexford's ability to carry out these deals, which I assured him was good. I notified Col. Rexford of our meetings and what happened."

Mr. Graves' testimony respecting his relations to Mr. Rexford, after the conversation with Mr. Tucker in June in Baltimore, is confused, and confusing. It seems that, from his viewpoint, if Mr. Rexford was still "in," he was his agent; if "out," he was not. He made no suggestion to Mr. Tucker that he would thereafter act as Rexford's agent. Mr. Graves, a few days after his examination, wrote a letter to Mr. R. P. Tucker in regard to his testimony. Upon a subsequent examination, he identified the letter and admitted that he wrote it. It was then received in evidence, under objection. It is competent, as a part of his subsequent examination, for the purpose of contradicting him, but is not very material, except as showing his attitude towards the transaction and the parties. Mr. R. P. Tucker says that, after the conversation with Mr. Graves in Charleston, May 11, 1908, he met him in Baltimore in June, 1908; that Mr. Graves was then endeavoring to sell the property for him.

"During that conversation (in Baltimore) I requested Mr. Graves to get Mr. Janes, who was an employé of the Empire Lumber Company of Buffalo, N. Y., over the phone, and ask him to come to Baltimore for a conference with me. I realized that Mr. Janes, as an employé of the lumber company, came in contact with a great many men who were interested in lumber and timber, and I thought that he could possibly assist Mr. Graves and myself in our efforts to sell the property."

He says that Mr. Janes came to Baltimore, and, as a result of the conference, Mr. Janes was to try to get some parties in Boston interested in the property. He failed in this effort. It was understood that

Mr. Graves would show him over the property at any time he desired to make an examination.

"As a result, Mr. Janes finally located Mr. J. H. Byrd of St. Louis, Mo., as a possible purchaser and wrote me, on November 5, 1908, giving the name and address of Mr. Byrd. I then arranged with Mr. Graves to show these gentlemen over the property, and he took them on the property, the Thursday after November 11, 1908. They stayed on the property, so far as I know, and I was in communication with them, off and on, until December 22, 1908, when they wired me accepting the property. Mr. Graves was introduced to Mr. Byrd at that time. I then arranged for these gentlemen to meet me in Charleston, to close the matter, on January 15, 1909, and requested Mr. Graves to be present at the meeting."

He says that he first met Mr. Byrd on January 15, 1909. Mr. Janes was unable to buy the land himself. Byrd furnished the money.

The depositions of Mr. Byrd and Mr. Janes were taken and constitute a part of the evidence. Mr. Byrd says that, in negotiating for the land, he never knew, or heard of, complainant, or that he was interested in the property. That he first heard of the land through Mr. Janes, in the summer (June) 1908, while in St. Louis, Mo. That he examined the land with Janes and Graves during the month of November, 1908; that was the first time he had seen Graves; had no correspondence with him. Graves said the land belonged to Mr. Tucker and that there were no options on it; the title was clear. That Janes said same. He paid the purchase money. That his attorney, Mr. McFarland, examined the title before the purchase.

Mr. Janes says that Graves told him that Mr. Rexford had held an option on the property but that it had expired. That he afterwards met Tucker in Baltimore, June, 1908. It is evident, from the testimony, that complainant is in error in saying that he had any transaction, either personally or through Graves, with Byrd and Janes. It seems that on March 24, 1908, Graves, acting as agent for W. A. Rexford, made a contract for the sale of the land situate in Oconee county, S. C., with George C. Wiles, upon which some amount was paid and some extension granted by Graves, but no further action was taken. It seems that Judge Stevens and Mr. R. B. Henley became interested in this contract; the latter paying $1,250 on account of it. His check payable to S. T. Graves, agent for W. A. Rexford, was delivered to R. P. Tucker by Graves on May 4, 1908. No one seems to be asserting any claims under this contract.

In so far as complainant claims to have any connection, either by himself or through his agent, Graves, with the sale to Janes and Byrd, the evidence shows that Byrd was not known to him, nor did he have any connection with, nor so far as the evidence shows knowledge of, these lands, or the parties dealing with them, prior to the summer of 1908. I am unable to find that any definite proposition, as to terms, was made and accepted for a sale to Marsh and Janes; what occurred was simply "chaffering." Neither of them appear to have been in a position to buy or pay for it. Graves says that he ceased to act as complainant's agent after the conversation with Mr. Tucker in Baltimore in June, 1908, and that he notified complainant of this conversation. It is impossible, therefore, to find that the sale made January 16, 1909, to Byrd

and Janes was on account of, or had any relation to, the contract of June 11, 1907, or the extensions thereof. The testimony of Byrd and Janes negative any such conclusion. Complainant concedes that he cannot have a decree enforcing specific performance of the contract, because Byrd and Janes, who hold the legal title to that portion of the lands situate in the state of Georgia, are not parties to the record. For manifest reasons the court would not decree partial performance of this contract. It is therefore immaterial whether Byrd and Janes or the Oconee Timber Company had notice of complainant's alleged equities. Defendants concede that the lands have been sold and conveyed at the price of $6.50 per acre. Complainant says that, but for the alleged wrongful conduct of defendants Southern Woodland Lumber Company and Tucker, in conveying the legal title and thereby disabling themselves from performing the contract, he would be entitled to a decree for specific performance, and that therefore he is entitled to have a decree declaring defendants trustees and calling them to account for the proceeds of the property, the legal title to which, by virtue of the contract, was impressed with a trust. If he shall succeed in sustaining his first contention, if he is entitled to specific performance, it follows that defendants are liable to account for the proceeds of the property.

[1] The right of complainant to relief is dependent upon well-settled principles of equity jurisprudence. His learned counsel stress the position, sustained by authority, that in equity a vendor who has entered into an executory contract, based upon a valuable consideration, to convey land, upon the payment of the purchase price, is regarded in equity as holding the legal title in trust, first, to secure the payment of the purchase money, and, second, to convey to the purchaser. A court of equity enforces the execution of the trust by making appropriate decrees, to meet the facts in the particular case. This is elementary. The learned counsel appear to overlook the fact that this equitable conception is based upon the theory that thereby the parties are compelled to perform their contract according to its terms. A court of equity, instead of leaving the complainant party to an action at law for damages for breach of the contract, conceives that, by this means, as said by a learned chancellor, "more perfect and complete justice is done." The basic purpose of the chancellor is to compel both parties to perform their contract according to its terms, not to relieve one party from performance and hold the other. The trust thus declared and enforced by the court of equity is based upon the contract, and jurisdiction is taken because it is conceived that the only remedy which a court of law administers is inadequate. The court of equity, in treating the vendor as a trustee, does not make a new contract, or change the contractual obligations of the parties, in respect to time of performance or otherwise. On the contrary, it enforces specific performance on the part of both the vendor and vendee, according to the terms of the contract, by regarding and treating the vendor as the trustee and the vendee as the cestui que trust, so molding its decree as to afford complete relief in accordance with the facts developed. Jurisdiction was taken in such cases by the court of equity, when land was the subject-matter of the contract, because of its peculiar character. It was thought that a judg-

ment at law awarding damages for a refusal on the part of the vendor to convey land, as he had contracted to do, did not do full and complete justice to the disappointed vendee, who was ready, willing, and able to perform the contract on his part, according to its terms. Usually parties bought land, not for speculation, nor to sell again, but to secure homes, or for cultivation, or improvement, thus promoting those objects which were favorites of the courts, advancing the permanent interest and prosperity of the state.

Prof. Pomeroy says:

"The remedy for the specific performance of contracts is purely equitable, given as a substitute for the legal remedy of compensation, whenever the legal remedy is inadequate or impracticable." Eq. § 1041.

"When land, or any estate therein, is the subject-matter of the agreement, the inadequacy of the legal remedy is well settled, and the equitable jurisdiction is firmly established." Section 1402.

If complainant had tendered, or alleged and proven that he was ready, willing, an able to perform his contract according to its terms, either as originally made, or as extended by the parties, and defendants had refused to perform on their part, the court would have compelled them to do so, either by a decree, commanding the execution of the deed, or declaring them to hold the legal title in trust; the terms of the trust would have been fixed by the terms of the contract, and by this equitable remedy specific performance of the contract would have been enforced.

[2] This remedy is given when one of the parties refuses to perform the contract according to its terms, and the other party is not in default. Complainant has, however, failed to meet and perform the contract, according to its terms, and is therefore compelled to invoke another equitable doctrine. In its desire to effectuate the real intention of the parties to contracts for the sale of land, and to relieve against forfeiture of legal rights, when to enforce them would work hardship and injustice, the chancellor looked beyond the letter of the contract and took into consideration the character or nature of the property involved, the conduct of the parties, both at the time of, and subsequent to, making the contract, and sought to ascertain whether it was their intention that its obligation should, in respect to time, be strictly observed and enforced. He frequently found what he regarded sufficient evidence to satisfy him that such was not their intention; that, by their manner of dealing with the property, or otherwise, they had, by acquiescence, indicated that neither of them intended to enforce strict performance and, upon this ground, and in furtherance of substantial justice, he so declared, giving to the party in default a reasonable time within which to pay the money and demand a conveyance of the property. Hence we find that, by reason of the many cases, in which this condition was found to exist, the maxim that a court of equity does not, in dealing with agreements for the sale of land, regard time as of the essence of the contract, found its way into equity jurisprudence. It was supposed, at one time, that the maxim was of such general and universal application that parties would not be permitted to stipulate otherwise; that, like the maxim, "Once a morgage, always a mortgage," it was not in

the power of the parties to a contract for the sale of land to provide, by express agreement, otherwise.

Lord Eldon said that this was not so. Seton v. Slade, 7 Ves. 265, 3 White & Tudor, L. C. Eq. 434. The reason of the maxim, as applied in many cases, is well expressed by Pearson, C. J., in Scarlett v. Hunter, 56 N. C. 84. There, the vendee gave his notes for the purchase money, bearing interest, and went into possession of the land. When the plaintiff sought to enforce the forfeiture by reason of the failure to pay the note when due, the court invoked the maxim, saying:

"It is taken for granted that the parties are content to allow matters to remain in statu quo until a movement is made by one or the other."

It was thought that the interest accruing on the deferred payment of the purchase price was satisfactory to the vendor and he was content to permit the vendee to remain in possession, improving and cultivating the land, until he called for the money. Usually when contracts of this character were made, but a small part of the purchase money was paid in cash. Of necessity, the courts made exceptions to the maxim and held that it did not apply when the terms of the contract, the character of the property, the purpose for which it was purchased, the conduct of the parties, or other "surrounding circumstances," negative the idea that it was understood between them that time was essential. It was always applied upon the theory that it effectuated the intention of the parties.

In White v. Bennett, 7 Rich. Eq. (S. C.) 278, Chancellor Wardlaw says:

"Time is not usually regarded in equity as of the essence of contracts, and anciently it was considered that it could not be rendered essential by the stipulation of the parties concerning lands; but the tendency of recen. decisions is to require persons concerned in contracts relating to lands, as in other contracts, to regard time as material."

So Mr. Justice Story, in Taylor v. Longworth, 14 Pet. 173, 10 L. Ed. 405, says:

"There is no doubt, that time may be of the essence of a contract" in equity "for the sale of property. It may be made so by the express stipulations of the parties, or it may arise by implication, from the very nature of the property, or the avowed objects of the seller or the purchaser."

The maxim, and its exceptions, were carefully considered, and the decisions of the English Chancellors reviewed, by Chancellor Kent, in Benedict v. Lynch, 1 Johns. Ch. 370, 7 Am. Dec. 484. After citing many authorities, he says:

"I do not perceive, therefore, that in the more ancient cases there is no (any?) real ground for the opinion that the time stipulated for the performance of a contract is of no real moment in this court, and I am at a loss to conceive how such an extravagant proposition could ever have gained currency. It is certainly, and very justly, exploded in the modern decisions."

Mr. Bispham states the doctrine, as administered in American courts of equity. He says, that, among the exceptions to the maxim are:

"The nature of the property, or the surrounding circumstances, which would make it inequitable to interfere with, or modify, the legal right * * * in regard to the 'surrounding circumstances,' which may render time of the es-

sence of the contract, they must of course depend upon the facts of each particular case; such as whether the value of the property had greatly diminished, whether the vendee has bought to sell again. Indeed, in this country, the fact that land bears a much more commercial character than it does in England, is subject to more fluctuations, and has more of a speculative value, has led to not a few expressions of judicial opinion that time ought, as a general rule, to be considered as of the essence of a contract. But perhaps the safest statement of the law is that the general rule is the same in the United States as in England, but that exceptions, growing out of the circumstances of the individual transactions, are more numerous and looked upon with more favor." Eq. 394.

So Prof. Pomeroy, after stating the general rule, says:

"Time may be essential. It is so whenever the intention of the parties is clear that the performance of its terms shall be accomplished exactly at the stipulated day. The intention must then govern. A delay cannot be excused. A performance at the time is essential; any default will defeat the right to a specific enforcement." Eq. 1408.

Judge Marshall says:

"If, then, a bill for a specific performance be brought by a party who is himself in fault, the court will consider all the circumstances of the case, and decree according to those circumstances." Brashier v. Gratz, 6 Wheat. 531, 5 L. Ed. 322.

Judge Story, in Taylor v. Longworth, supra, says:

"Relief will be decreed to the party who seeks it, if he has not been grossly negligent, and comes within a reasonable time, although he has not complied with the strict terms of the contract. But in all such cases, the court expects the party to make out a case free from all doubt; and to show that the relief which he asks is, under all the circumstances, equitable; and to account in a reasonable manner for his delay and apparent omission of duty."

Chancellor Kent, in Benedict v. Lynch, supra, says:

"From the review which I have taken of the cases, the general principle appears to be perfectly established that time is a circumstance of decisive importance, in these contracts, but it may be waived by the conduct of the party; that it is incumbent on the plaintiff, calling for a specific performance, to show that he has used due diligence, or, if not, that his negligence arose from some just cause, or has been acquiesced in. And it is not necessary for the party resisting the performance to show any particular injury or inconvenience; it is sufficient if he had not acquiesced in the negligence of the plaintiff, but considered it as releasing him."

In Thompson v. Dulles, 5 Rich. Eq. (S. C.) 370, the following language is quoted with approval from Story's Eq. § 776:

"Though time is not, generally, deemed in equity to be of the essence of the contracts of sale, unless the parties have expressly so treated it, or it necessarily follows from the nature and circumstances of the contract, yet courts of equity have regard to time, so far as it respects the good faith and diligence of the parties."

In Falls v. Carpenter, 21 N. C. 237, 28 Am. Dec. 592, Ruffin, C. J., says:

"It is not denied that time is material in equity. It is always respected here, nor is it denied that time may be of the essence of a contract. Exact punctuality may be of great importance to the interests of a contracting party in many situations. * * * In others, we do not doubt that the instrument may be so framed as to show what is true, namely, that it is a substantial part of the contract. In those cases, a court can no more dispense with that

than any other vital provision. But the parties themselves can dispense with it; and the inquiry, where it has once existed, is whether they have done so."

Specific performance was enforced, upon the facts in that case.

[3] Before proceeding to a discussion of the facts in this record, it will be well to notice another fundamental maxim, or principle, in equity, applicable to bills for specific performance. It is said:

"But, even when a particular contract belongs to such a class, the right to its specific performance is not absolute, like the right to recover a legal judgment. The granting the equitable remedy is, in the language ordinarily used, a matter of discretion; not of an arbitrary, capricious discretion; but of a sound, judicial discretion, controlled by established principles of equity and exercised upon a consideration of all the circumstances of each particular case." Pom. Eq. 1404.

Gaston, J., in Leigh v. Crump, 36 N. C. 299, says:

"The specific execution of a contract in equity is a matter not of absolute right in the party, but of sound discretion in the court. * * * Although it be valid at law, and, if it had been executed by the parties, could not be set aside because of any vice in its nature, yet, if its strict performance be, under the circumstances, harsh and inequitable, a court of equity will not decree such performance, but leave the party claiming it to his legal remedy."

In Lloyd v. Wheatly, 55 N. C. 267, Battle, J., says:

"Even the mere fact that the contract is a hard one and would press heavily on the defendant will induce the court to withhold its aid, and leave the plaintiff to his remedy at law."

In Calverley v. Williams, 1 Vesey, Jr., 201, it is said:

"Nor will a court of equity enforce a contract according to its terms, when to do so would violate the real object of the contract in the minds of the parties when the contract was made, and produce a result not contemplated at the time of the execution of the agreement." Rudisill v. Whitener, 146 N. C. 403, 59 S. E. 995, 15 L. R. A. (N. S.) 81; Hardy v. Ward, 150 N. C. 385, 64 S. E. 171.

In Thompson v. Dulles, 5 Rich. Eq. (S. C.) 370, the chancellor says:

"The principle is sound and just, and demanded alike by morals and by policy, that he who has neglected to perform a duty which he might have performed, and ought to have performed, has no claim upon the court to compel the other party to perform his engagements. Whenever such negligent party comes into this court, he must be told that he has neglected to do equity, and has therefore deprived himself of the equity he claims."

In Willard v. Tayloe, 8 Wall. 557, 19 L. Ed. 501, cited by complainant, it is said:

"When a contract is of this character, it is the usual practice of courts of equity to enforce its specific execution upon the application of the party who has complied with its stipulations on his part, or has seasonably and in good faith offered, and continues ready to comply with them. But it is not the invariable practice. This form of relief is not a matter of absolute right to either party; it is a matter resting in the discretion of the court, to be exercised upon a consideration of all of the circumstances of each particular case." Seymour v. Delancy, 3 Cow. (N. Y.) 445, 15 Am. Dec. 270.

In Strickland v. Fowler, 21 N. C. 630, the principle is recognized that the right to relief depends upon the circumstances, and whether plaintiff is in, or out, of possession.

In Bateman v. Hopkins, 157 N. C. 470, 73 S. E. 133, Ann. Cas.

1913C, 642, the vendor waived a strict compliance by the vendee, who was ready, willing, and able to comply. The vendor repudiated the contract—insisted that he was not bound.

The impression, to some extent, prevails that a court of equity disregards time in the enforcement of contracts and, in that respect, makes a new and different contract for the parties. This impression has foundation in language used, in some cases, by judges. The value to be attached to such expressions depends largely upon the facts in the case under consideration. The language of Chancellor Kent in Benedict v. Lynch, supra, states the correct view. He says:

"It may, then, be laid down as an acknowledged rule in courts of equity, and so the rule is considered in the elementary treatises on this subject, * * * that where the party who applies for specific performance has omitted to execute his part of the contract by the time appointed for that purpose, without being able to assign any sufficient justification or excuse for his delay, and when there is nothing in the acts or conduct of the other party that amounts to an acquiescence in that delay, the court will not compel a specific performance. This rule appears to me to be founded on the soundest principles of policy and justice. Its tendency is to uphold good faith and punctuality in dealing. The notion that seems much to prevail (and of which the facts in the present case furnish an example), that a party may be utterly regardless of his stipulated payments, and that a court of chancery will, almost at any time, relieve him from the penalty of his gross negligence, is very injurious to good morals, to a lively sense of obligation, to the sanctity of contracts, and to the character of this court."

Chancellor De Saussure, in Doar v. Gibbes, Bailey, Eq. (S. C.) 371, well says:

"Specific performance of an agreement to sell lands will not be enforced against the vendor. when the vendee has neglected to comply ,with conditions stipulated by the agreement, within the time limited by it, and the vendor has, in consequence, sold and conveyed to another purchaser."

In Brashier v. Gratz, supra, Judge Marshall says:

"This, then, is a demand for a specific performance, after a considerable lapse of time, made by a person who has failed totally to perform his part of the contract; and it is made after a great change, both in the title and in the value, of that which was the subject of the contract, and by a person who could not have been compelled to execute his part of it, had circumstances taken an unfavorable direction."

Brazier was insolvent.

[4] Without further extending the citation of authority, although I have, so far as possible, examined the cases cited by complainant, the merits of the controversy may be dealt with. The evidence fails to show that complainant took, or expected to take, possession of the land. He failed to pay the tax assessed upon it. He had, during the spring of 1907, been discharged of his debts by a bankrupt court. It seems that this fact was not known, or communicated, to defendants; there is no suggestion that he had any resources of his own with which to pay the purchase money. While in the form of a bilateral contract, the transaction, so far as its enforcement by legal proceedings was concerned, was but an option. That prompt payment of one-third of the purchase price, on September 9, 1907, was contemplated by the vendors, is manifest. It is but just to complainant to say that he also contemplated prompt payment; his conduct sustains this view.

The defendants did not hold the land as an investment, or with a view to its cultivation or improvement; it was held for sale; it does not appear what proportion of the acreage was held in fee and in timber "or timber rights." It is equally clear that complainant was contracting to buy for the purpose of immediate resale; he so avers in his bill. The element of pretium affectionis did not enter into the transaction. There is no suggestion that he had the money or resources with which to pay the purchase money otherwise than by a sale, or that he contemplated improving, clearing, or cultivating the land. The transaction was speculative, commercial, and, in this domain of business, time of performance is always essential. The value of timber rights and timber lands, it is well known, fluctuates in response to commercial, industrial, financial, and other disturbing conditions. It is manifest that the payment of the purchase price, at the time it was due, was of importance to the vendors. The telegrams and other correspondence show that they were using the obligation of complainant as a basis for credit, or collateral, in banks. This was known to him.

While defendants complied with every request made by complainant for extension of time, they, on each occasion, insisted, and he promised, that the money should be paid according to the terms of the original contract, as extended. Complainant was, in each instance, notified of the condition existing; that the banks were carrying the paper, or extending accommodation to defendants upon it. Defendants were anxious to consummate the trade and to extend to complainant every reasonable accommodation to enable him to complete the purchase. It does not appear that complainant went to see Mr. Tucker, as he was repeatedly requested to do, or that he expended any time or money in endeavoring to meet his engagements. The only suggestion which he makes, explanatory of his failure to meet his obligation, is the sickness of his father and the "panic of 1907." When he asked for extension on account of his father's illness, on March 11, 1908, after two extensions had been granted, he does not, in his telegram, say that he expected to get the money from his father, but that he is detained at Elmira by his father's sickness; "Can fix as soon as can leave." He is granted the extension asked for on that account. He does not show, by his father, or otherwise, that he (his father) was able, or willing, or expected to aid him. He says that he did not let his father into the contract. The conditions produced by the panic, doubtless, also affected defendants. Tucker states his experience, by reason of complainant's failure to meet his obligation, quite strongly. He writes March 16, 1908: "I do not think you realize how hard it is for me to arrange this matter for you, but I am very glad that I have been able to do so." He told Graves that complainant's failure to meet his obligation had caused him to "sweat blood." Complainant, in his letters to Tucker, does not suggest that he expected to get the money from his father. In asking the bank for an extension on the notes due March 18, 1908, until April 25th, he says: "Will surely have money for you by the above named time." This extension was granted with the statement: "Must be met then."

The president of the bank writes, confirming the telegram, saying: "Will again say that we shall expect payment at that time." No payment was made on April 25th, whereupon the bank, on April 27th, wires him calling his attention to the situation. On April 29th, Tucker wires him that the banks are calling on him "to make good your paper. Answer definitely, quick."

From that day until May 18th, telegrams passed between the parties; defendant Tucker urging payment, complainant promising, and failing, to pay. Tucker continued, up to July 13th, to urge settlement, but after May 13th he received no response, until, July 20, 1908, complainant makes an entirely new proposition, making no reference to the original contract: "Will pay you August second for nineteen thousand acres. One third cash—balance one, two years—bankable paper. Trying to make it all cash." It will be observed that Graves says that, some time before the last date, he had a conversation, in Charleston, with Tucker, trying to get an extension, and failed; that, again in June, in Baltimore, he met Tucker and had conversation with him, both of which are set out in the evidence; and that he notified complainant of both conversations. He therefore knew, when he made the proposition of July 20th, that Tucker regarded the contract of June 11, 1907, and the extensions thereof, at an end—abandoned. It is true that Tucker, on several days during July, had wired, urging him to do something, but to these no response was made. Complainant, in his testimony, is not quite frank in reference to this phase of the matter. He is shown the telegram from Tucker, of July 25, 1908: "Telegram received. Absolutely necessary for us to have conference immediately. Wire quick what day next week you can be here." And when asked, "What was that conference concerning?" says, "I suppose our deal." "That is the only business you had with him?" "Yes, sir." The inference to be drawn from these questions and answers is that the telegram of July 25th referred to the "deal" of June 11, 1907, whereas, when complainant's telegram of July 20th is introduced, it is apparent that Tucker was referring to the proposition contained in it. Although Tucker sent several telegrams after that of July 25th, urging complainant to make good his last proposition, he utterly failed to do so.

Again, complainant says that he was never notified that defendants insisted or claimed that he had forfeited all claims under the contract; whereas, his agent and witness, Graves, says that he notified complainant of the conversations with Tucker in Charleston and in Baltimore. Both were prior to July 20, 1908. He therefore must have known, before that time, that Tucker regarded the contract forfeited; this explains his proposition of July 20, 1908. Notwithstanding his proposition of that date, and Tucker's repeated expression of his willingness to consider it up to August 11, 1908, when he wired, "Please wire me immediately and definitely what you propose doing," he does nothing, makes no response to this urgent request to say what he proposed doing. No further communication is had between the parties until on November 28, 1908, when Tucker writes Graves for the abstracts and plats of the land. This letter is introduced by complainant. In it Tucker refers to the negotiation with Janes; urges Graves to hurry

him up. Thus complainant had notice that he was endeavoring to sell to Janes. On January 4, 1909, he writes Tucker, referring to the letter to Graves, and saying: "I am sending you, by express, to-day, prepaid, the book of abstracts and the blueprint of the Georgia lands. The book of plats is in Elmira, N. Y. I have ordered it shipped here and should you think you will need it, I shall ship it to you on request." On January 6th Tucker acknowledged receipt of the express receipt and requested complainant "to forward receipt as soon after their arrival in Asheville as practicable."

The two grounds upon which defendants rely, as a defense to the bill, are that, time being of the essence of the contract, complainant is not entitled to invoke the equitable power of the court to enforce specific performance, and that complainant, recognizing the fact that he had forfeited his rights under the contract by his failure and inability to pay the purchase money according to its terms as extended, abandoned all rights under it. A careful examination of the evidence discovers that, at the time they entered into the contract, and when defendants granted the several extensions, they understood and expected that the money was to be paid when due; that this was essential to the preservation and enforcement of their obligations; that complainant recognized this to be so, and by his offer on July 20, 1908, to make a new and different contract, his return of the abstracts and plats on January 4, 1909, and his effort through his attorney, Mr. J. H. Tucker, on January 15, 1909, to secure "some consideration" to "get a settlement," and his failure to file his bill until April 28, 1910. All of these acts indicate that he was fully aware of the fact that he had forfeited any rights which he had under the contract. He has never, at any time, offered to pay the money, or shown that he was able; on the contrary, every declaration, coming from him, shows that he was unable to do so. He was not entitled, either at law or in equity, to compel defendants to hold, for an indefinite length of time, a large body of timber land and timber rights, the value of which was fluctuating, when he well knew that they were anxious to sell, compelled to secure credit from the banks to enable them to "carry" the property, and he was unable to raise the money or respond to a judgment for its recovery.

[5] The complainant cites a number of cases discussing the right of one party to a contract to rescind, or ask for a decree of rescission. The question of rescission is not presented, either by the prayer for relief, or the evidence in this case. The duty of one party to a contract, who seeks to rescind, to restore to the other party the amount received by him in part performance, or on account of the contract, is well settled and always enforced. In such cases the actor must "do equity," as the condition upon which he is given relief. Here the defendants are not invoking any aid of the court; they have neither rescinded the contract, nor do they ask the court to do so; they simply stand upon their rights under the contract, relying upon its terms and the failure of the complainant to perform his obligation as a defense to his suit. An application to a court of equity for a decree rescinding a contract is usually based upon some element of illegality, fraud, mutu-

al mistake, or some other invalidating circumstance. The distinction between the principles controlling the equity for rescission and for specific performance is fundamental. Courts and text-writers sometimes speak of the refusal of the vendor to convey, after the vendee has failed to pay the purchase money, as an election, on his part, to rescind the contract, or treat it as rescinded. This language does not accurately describe the conduct of the vendor, nor the status of the contract. The contract, in this case, remains in full force and effect; neither party has changed or modified it, or the legal obligations assumed or created by it. Complainant, relying upon his conception of his remedial rights, under the contract, in a court of equity, demands specific performance on the part of defendants, with a prayer for such other and further relief as, upon the evidence, he is entitled to. Defendants resist this demand, insisting that the obligations, upon the performance of which the equitable remedy invoked depends, has not been performed by complainant, and that therefore he is not entitled to any relief in a court of equity.

In Glock v. Howard-Wilson Col. Co., 123 Cal. 1, 55 Pac. 713, 43 L. R. A. 199, 69 Am. St. Rep. 17, Mr. Justice Henshaw, in a well-considered opinion, says:

"While it is essentially true that in case of a rescission the vendee may demand that he be restored to his original condition, it does not follow that a vendor who refuses to convey after such breach by the vendee thereby rescinds. To the contrary, in refusing to convey after the vendee's default, he is not treating the contract as at an end, but is expressly standing upon it, and basing his rights upon its terms, covenants, and conditions."

This is an accurate description of the status of defendants in this case. They are asking no relief of the court; they are standing strictly on the defensive and abiding by the terms of the contract.

[6] Complainant avers that defendants are in default, because they did not tender a deed for the land. By reference to the terms of the contract, it appears that the defendants obligated themselves to deliver the deed of conveyance "on the payment of the amount falling due hereunder 90 days from the date hereof." In extending the time for payment of this amount, the parties expressly kept in full force and effect the terms of the contract of June 11, 1907. Until the payment of the amount due on the 11th day of September, 1907, or on the day to which it was extended, defendants were under no obligation to tender a deed.

[7] To the suggestion that before defendants were entitled to call for payment of the one-third due September 11, 1907, they were required to have the lands surveyed and the exact number of acres ascertained, it is sufficient to refer to the language of the contract; the number of acres in each tract is stated with either a reference to a survey, or other description; it is manifest that no further survey was contemplated. The frequent requests for extension, and the execution of notes for the one-third of the purchase money, without any suggestion that a survey was demanded or expected, together with the failure on the part of complainant in the bill, or in his testimony, to make such suggestion, excludes the idea that it was in the minds of either of the parties.

[8] Complainant calls attention to the failure of defendants to return his notes. It is true that the retention of notes given by a vendee for the purchase money of land is usually considered as a strong circumstance tending to negative the idea that the vendor regards the right of the vendee as forfeited, or his rights abandoned, and, with other sustaining evidence, would properly have great weight in the mind of the chancellor. It is in evidence here, however, that R. P. Tucker said to complainant's attorney that he did not consider the notes of any value and was ready to surrender them. This offer is repeated in the answer. All of the evidence tends to show that they are of no value. The failure of defendants to return them is not sufficient to overbalance the abundant evidence that, by their conduct as well as Tucker's declarations, the parties regarded the rights of complainant as at an end. Complainant made no offer, nor did he express any purpose, to pay for the land, after May 13, 1908; his attorney, January 16, 1909, simply said that he thought that he was "entitled to some consideration," and wished to have a settlement. There was never any controversy as to the amount due, but one settlement could be made according to the terms of the contract as extended—payment of the balance then due; this was not proposed by his attorney. It will be further noted that, under the terms of the agreement to extend the time of payment of the one-third, no extension had been asked or granted as to the balance of the purchase money; on the contrary, it was expressly stipulated that, in all other respects, the terms of the contract remained in force. Hence there was due on September 11, 1908, the second installment of the purchase money and interest thereon from September 11, 1907. The language used by Lord Chancellor Loughboro in Floyd v. Collett, 4 Bro. Ch. 469, is very appropriate: "If a given default will not do, what length of time will do?" I am clearly of the opinion that the complainant is not entitled to specific performance, nor to an accounting for amount received by defendant for the land.

[9] The sole question, remaining for consideration, is whether, upon the evidence, complainant is entitled to recover the amount paid on account of the purchase money. No such relief is demanded, nor is the bill drawn with such object. The prayer for general relief, however, invites a consideration of every phase of the testimony.

[10] The entire purchase price amounted to $277,062.50, upon two-thirds of which interest was to be computed from September 11, 1907, payable annually. Assuming that complainant had complied with his contract on May 13, 1908, the due date of the last extension, the interest then due would have closely approximated the amount paid by him.

In Hansbrough v. Peck, 5 Wall. 497, 18 L. Ed. 520, it appeared that, under a contract to convey real estate upon the payment of the purchase money ($134,000) in stipulated installments, time being declared essential, the plaintiff paid $28,000 interest and $10,000 on account of the notes in addition to a large outlay for improvements. After forfeiture for failing to make payment according to the terms of the contract, he brought suit to recover the amount paid. The court dismissed the bill. Mr. Justice Nelson said:

"No rule in respect to the contract is better settled than this: That the party who has advanced money, or done an act in part performance of the agreement, and then stops short and refuses to proceed to its ultimate conclusion, the other party being ready and willing to proceed, * * * according to the contract, will not be permitted to recover back what has been advanced or done. * * * We have thus gone carefully over the case as presented, and considered every ground set up on the part of the plaintiffs for the relief prayed for; but, with every disposition to temper the sternness of the law as applicable to them, we are compelled to say that, according to the settled principles both of law and equity, a case for relief has not been established. The truth of the case is that these plaintiffs improvidently entered into a purchase beyond their means, and, doubtless, relied very much upon the rise of the value of the estate, and of the income, to meet the payments and expenditures laid out upon it. Their anticipations failed them, etc."

In Glock v. Howard-Wilson Colony Co., supra, the question is discussed and the same conclusion reached. It is said:

"Upon his (plaintiff's) failure to make payment the vendee committed a breach, and no affirmative act upon the part of the vendor was necessary to bring about this result. Months after, and without any equitable showing to relieve the default, the vendee makes tender, and because of its refusal claims the right of recovery. But the vendor, in refusing to accept the tender and repay the money, is neither violating his contract nor rescinding it, nor treating it as at an end. He is standing squarely upon its terms, * * * and a court of equity, no more than a court of law, will relieve a vendee, under such circumstances, from penalties arising from the breach of such condition, in the absence of any equitable showing to excuse his default."

In the instant case, no tender of the balance due was made by complainant.

Sanders v. Brock, 230 Pa. 609, 79 Atl. 772, 35 L. R. A. (N. S.) 532, is very much in point. Plaintiff entered into a contract with defendant for the purchase of a lot in the city of Philadelphia, paying $1,000 cash and $1,000 in addition, for an extension. Plaintiff failed to pay the balance when due, although defendant was ready to comply and tendered a deed. Defendant sold the lot for an advanced price. Plaintiff sued in assumpsit for the amount paid. The court held that he was not entitle to recover. The opinion is sustained by citation of abundant authority. The learned justice pertinently asks:

"Must he (the vendor) forever continue to hold the property to await the offer and convenience of the purchaser, giving to the latter an opportunity to complete the purchase if the property advanced in price, or refuse if its value diminished, and, in the meantime, subject the vendor to the risk of a loss, possibly imperiling his financial standing?"

The law imposes no such unreasonable requirement on a party who has, in good faith, kept and offered to perform the stipulations of the contract. It is true that many cases may be found, some of them cited by counsel for complainant, in which the court has required the vendor, who has received a portion of the purchase money, to account for it— when the vendee has forfeited his right to demand strict performance. It will be found that they rest upon the peculiar facts in each case rendering it inequitable for the vendor to retain the money. In such cases either the amount paid was a very large proportion of the contract price, or the vendee had taken possession and made improvements upon the land, or the vendor had repudiated, or refused to perform, the con-

tract according to its terms, or disclosed other equitable elements appealing to the conscience of the chancellor.

Of the cases cited by complainant, Lewis v. Hawkins, 23 Wall. 120, 23 L. Ed. 113, was a bill by the vendor to subject the land to sale for the payment of the balance due on the purchase price; the vendee was in bankruptcy. In Brown v. Guaranty Trust Co., 128 U. S. 403, 9 Sup. Ct. 127, 32 L. Ed. 468, the court found abundant evidence of acquiescence in delay of payment excluding the idea that either party regarded time as of the essence of the contract. It is uniformly held that, in such cases, the vendee is relieved from strict performance, as, when the vendor relies on the statute of frauds, the contract not being in writing, the court will require him to account for the enhanced value of the land by reason of improvements and the amounts paid in the purchase money, before ejecting the vendee. Gaston, J., says that, in such cases, "it is against conscience that they (the vendors) should be enriched by gains thus acquired to his (vendee's) injury." Albea v. Griffin, 22 N. C. 9. All of these cases are based upon the fact that the vendor has either refused to perform, repudiated his contract, or been guilty of unjust and inequitable conduct. None of these elements are found in this evidence. The defendants not only did not refuse to execute the contract, according to its terms, but granted every indulgence and extension requested by complainant, reserving always the provision that he was expected to meet his engagements promptly, and this complainant always promised, and always failed, to do. Certainly this indulgence should not, now, be imputed to defendants as inequitable or unrighteous. It never misled complainant into supposing that he was to have an unlimited time to pay for the land.

Upon a careful examination of the evidence, exhibits, and very helpful briefs of counsel for the respective parties, I am brought to the conclusion that complainant is not entitled to a decree for specific performance, and is therefore not entitled to any other relief in this court. I have not discussed the question of laches urged by defendants. The complainant certainly knew in June, 1908, that defendants regarded the complainant as in default and refused to further extend the time. He was informed by his agent, S. T. Graves, that no further extension would be granted. He had in his possession defendants' letter to Graves, November 28, 1908, in which he expressly stated that he was negotiating with Janes for a sale of the land, and therefore wished a return of the plats and abstracts. On January 15, 1909, his attorney knew that Janes and Byrd were in Charleston for the purpose of closing the negotiation for the purchase of the property. Notwithstanding all of this, he remains quiescent until April 28, 1910, when he files his bill— all of this without any explanation or assigning any reason therefor. He has never tendered the purchase money, nor does he allege or show that he ever intended or was able to do so.

In view of all of the circumstances, there was unreasonable delay. The bill will be dismissed, at complainant's cost. I will hear a motion to divide the allowance, to the special master, for taking the testimony. A decree may be drawn in accordance with this opinion.