## VIRGINIA SHIPBUILDING CORPORATION et al. v. UNITED STATES.

Circuit Court of Appeals, Fourth Circuit.
October 18, 1927.

No. 2598.

1. Shipping ⬤═24—Contract by shipbuilding company in default under construction contract to buy ships from government held executed sale, and government became mere creditor holding title as security.

Where shipbuilding company was in default under contract for construction of steel ships for Fleet Corporation, representing the government, and largely indebted for advances when parties executed supplementary contract by which shipbuilding company agreed to buy the ships on terms fully stated, and requiring initial payment on each as completed with a lien reserved for the remainder of the agreed price, *held* that contract was not mere executory agreement to sell, but an executed sale, and government became mere creditor, holding title to ships and materials as security for advances, and was bound to surrender its rights in ships and material when indebtedness was paid or funded in accordance with contract.

2. Shipping ⬤═27—Government's contract to sell ships held not abrogated by subsequent modification recognizing buyer's obligations.

Government's contract to sell to shipbuilding company vessels under construction for government *held* not changed in its nature as a sale by supplementary contract which expressly recognized shipbuilding company's "equity" in the ships and its obligation to take and pay for them with notes and mortgages in reimbursement of advances by government.

3. Shipping ⬤═27—Government's contract of sale of vessels held not abandoned or rescinded by government's seizure of vessels on buyer's default.

Government's contract for sale to shipbuilding company of vessels under construction for government, in which government retained title merely as security for advances, *held* not abandoned or rescinded by government's seizure of vessels and material, under provisions of contract, on buyer's default.

4. Shipping ⬤═27—Seller's failure to deliver legal title because of buyer's failure to perform conditions held not to relieve buyer of its obligation under contract.

Where contract by government for sale to shipbuilding company of vessels under construction for government was executed sale, with title only retained by government to secure advances, government's failure to deliver bills of sale conveying title to company or to its nominee under contract *held* not to relieve company of its obligation, where legal title was not conveyed because company did not comply with conditions entitling it to conveyance.

5. Equity ⬤═57—Seller retaining title under executed contract held entitled to foreclosure on buyer's failure to perform, under maxim regarding as done that which should have been done.

Where government failed to deliver legal title to ships because of buyer's failure to perform conditions entitling it to conveyance under executed contract of sale, *held* that government as aggrieved party was entitled to foreclosure and to have proceeds of ships applied on debt, in application of maxim that equity regards that as done which should have been done.

6. Equity ⬤═57—Written executory contract to convey property as security creates equitable lien, under maxim that equity regards as done what ought to be done.

An express executory contract in writing, whereby a party promises to convey, assign, or transfer property as security for a debt or other obligation, creates an equitable lien on the property, under the maxim that equity regards as done that which ought to be done.

7. Equity ⬤═57—Equity regards purchaser of realty or chattels as real owner, subject to liability for unpaid price, and seller as holding legal title as security.

In application of maxim that equity regards as done what ought to be done, court of equity will in a proper case regard purchaser under executory contract for sale of land or chattels as real owner of the property, subject to liability for the unpaid price, and the seller as holding legal title merely as security, but this will be done only in cases where equity will decree specific performance of contract.

8. Specific performance ⬤═68—Contract for sale of chattels will be specifically enforced where legal remedy is inadequate.

Though ordinarily specific performance of contract for sale of chattels will not be decreed, relief is denied in such cases solely because remedy at law is deemed adequate, and, where legal remedy is inadequate, specific performance will be decreed.

9. Appeal and error ⬤═1010(1)—Trial court's finding supported by evidence will not be reversed unless clearly wrong.

Finding of trial court, supported by evidence, will not be reversed on appeal, unless trial judge has misapprehended the evidence or gone against clear weight thereof.

10. Sales ⬤═177—Buyer could not avoid contract because of depreciation of market value of property.

The fact that the market value of property, which was the subject-matter of a sale largely depreciated before the time for delivery, did not give purchaser any equity to impose the loss on the seller.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Alexandria; Edmund Waddill, Jr., Judge.

Suits by the Virginia Shipbuilding Corporation against the United States Shipping Board Emergency Fleet Corporation, and by the United States against the Virginia Shipbuilding Corporation and others, consolidated before trial. From the decree rendered (292 F. 440), the Virginia Shipbuilding Corporation and Joseph L. Crupper, its receiver in bankruptcy, appeal. Affirmed.

See, also, 11 F.(2d) 156.

This is an appeal from a decree entered in two suits which were consolidated before hearing in the court below. The first of these was instituted by the Virginia Shipbuilding Corporation against the United States Shipping Board Emergency Fleet Corporation for an accounting under certain contracts, and for specific performance of an agreement providing that ships constructed under the contracts should be conveyed to the shipbuilding corporation. The second suit was instituted by the United States, against the Virginia Shipbuilding Corporation and its receiver in bankruptcy, the United States Transport Company, and others interested in the contracts or in the ships and property, to which the contracts related, for foreclosure of an equitable lien or mortgage upon the ships, for an accounting between the parties, and for sundry other relief, which it is not necessary to consider upon this appeal. Circuit Judge Waddill, who heard the case in the District Court, found that the United States held an equitable mortgage upon the ships in controversy and decreed foreclosure of same. The ships were sold, and the rights of intervening lien claimants in the proceeds of sale were established. An account was taken, and a final decree was entered, under which, after crediting the Virginia Shipbuilding Corporation with the value of the ships at the time of their seizure, the United States was granted a recovery against that corporation for the sum of $11,589,533.53 and interest, and against the United States Transport Company for the sum of $562,-699.70 and interest. From the final decree, the Virginia Shipbuilding Corporation has appealed to this court.

The facts necessary to an understanding of the controversy are as follows: On December 7, 1917, the Fleet Corporation, representing the government of the United States, entered into a contract with the Groton Iron Works for the construction of twelve steel ships. Shortly thereafter the Groton Iron Works, with the consent of the Fleet Corporation, transferred its rights under this contract to the American Shipbuilding Company, a corporation whose name was later changed to Virginia Shipbuilding Corporation. This contract provided for the construction of twelve steel vessels of 9,400 tons' dead weight carrying capacity, for which the government, through the Fleet Corporation, was to pay the sum of $1,504,000 each, with provision for additional compensation to cover increase in wages and certain other construction costs. Steel was to be furnished by the government, and progress payments were to be made as the work advanced. Title to all vessels, either completed or under construction, was to be in the government, as was title to all material assembled, contracted for, or used in the carrying on of the work. After the work on the ships had commenced, supplemental contracts were entered into, under which two loans, in addition to the progress payments, were made to the shipbuilding corporation amounting to $750,000 and $394,182.22, respectively, secured by mortgages on its plant.

Work was delayed under the contract and disputes arose under its various provisions. On September 9, 1919, only two ships had been delivered, and the shipbuilding corporation was indebted to the Fleet Corporation, representing the government, for materials advanced, for progress payments and for money loaned, in a sum admittedly as much as $12,000,000 or more. On that date the Shipbuilding Corporation wrote a letter to the United States Shipping Board and to the Fleet Corporation, offering to take over all of the rights and obligations of the Fleet Corporation under the contract and to reimburse the Fleet Corporation for all moneys expended or to be expended by it in connection with the contract. This letter, which throws much light upon the contract entered into sixteen days later, was as follows:

"The Virginia Shipbuilding Corporation hereby offers to take over from the United States Shipping Board Emergency Fleet Corporation all its rights and obligations under its contract No. 145 S. C. with the Virginia Shipbuilding Corporation.

"In payment we propose to reimburse the Fleet Corporation for all moneys heretofore or hereafter expended by it in connection with this contract and chargeable to us, including plant loans, progress payments, pay rolls, ship construction costs, the entire amount of hull steel, the entire amount of schedule C and other materials, and all other charges against us; payment to be made as follows:

"Ships when completed shall be delivered to the Virginia Shipbuilding Corporation. On the delivery of each of the first eight ships, we will pay to the Fleet Corporation in cash $450,000 and will give a mortgage on the ship for $1,350,000 more, payable with interest at five (5) per cent., $225,000 six months after delivery of the ship, $225,000 twelve months after delivery of the ship, and $112,500 every six months thereafter until

fully paid—we to have the right, however, to pay off the mortgage in whole or in part any earlier date. The mortgage shall contain the usual provisions for insurance, sufficient to cover the amount due under the mortgage, subject to the approval of the Fleet Corporation. After the delivery of the mortgage on any ship, neither the Fleet Corporation nor the Shipping Board nor the United States government shall have any further right, title, or interest of any nature whatsoever in that ship except the lien for the unpaid portion of the mortgage.

"Construction shall go forward subject in all respects to supervision by the Fleet Corporation as at the present time, and payments by us on the first eight ships shall be turned in to the controlled account to be used by the Fleet Corporation in meeting pay rolls and ship construction bills as under the existing arrangement.

"The initial cash payments and mortgages on the first eight ships will total $14,400,000, which is over $2,000,000 more than has been advanced thus far by the United States Shipping Board. It is estimated that this $2,000,000 is sufficient to cover the cost of continuing the work under the contract until the first eight ships are completed. If not sufficient, however, such further sums as may be necessary will be furnished by the Virginia Shipbuilding Corporation and in no event will the Fleet Corporation have to put in additional money of its own with respect to this contract. It is understood that we shall not become obligated to pay more than the total amount expended by the Fleet Corporation in connection with this contract, and the last mortgage given shall be adjusted accordingly so that it shall not exceed the amount of said expenditures not then repaid or secured by previous mortgages on ships.

"When the total of initial and subsequent payments plus the mortgages upon the ships equals the total expenditures of the Fleet Corporation, now or hereafter made in connection with this contract, then the Fleet Corporation shall give up such other security for its advances as it may hold, and turn over to us the unfinished ships and other material at the yards for our own use.

"As part of this arrangement, the Virginia Shipbuilding Corporation expressly waives and relinquishes all claims against the Fleet Corporation or the Shipping Board for progress payments, extras, excess wages due to the Macy award, and every other claim of any nature whatsoever.

"Since the first two ships are now in the ocean, there must be credited on our first payments in respect to these two ships (which will be done on their delivery to us) the amount of money received on them for freight, after deducting the expense of operating—this freight money to be paid into the controlled account as though paid by us as part of our initial cash payments.

"As evidence of our good faith, we inclose a cashier's check for $100,000, as a deposit on the contract in contemplation of the immediate delivery to us of the third ship, the Vanada, which is practically completed, and we agree to pay $125,000 more seven days after the acceptance of this proposal, and the remaining $225,000 of the initial payment fourteen days after the acceptance of this proposal.

"The obvious advantage of this mode of settlement is that all of the controversies hitherto existing are avoided, while the government not only stops at once the payment of any further money under this contract, but will be completely reimbursed for every dollar heretofore expended."

The offer contained in this letter, except as to price of ships and details of payment, was accepted in substance, and a formal written contract in accordance therewith was executed on September 25, 1919, the pertinent provisions of which are fully set forth in the opinion of Judge Waddill in the District Court, reported in 292 F. at pages 443 to 447. To summarize this contract briefly, it provided that, in settlement of all differences between the parties, the shipbuilding corporation should be credited with $800,000 for canceling the order for the construction of hulls 11 and 12; that the shipbuilding corporation should purchase the Vanada, hull No. 3, the Gunston Hall and Betsy Bell, hulls 1 and 2, subject to existing commitments, as soon as same could be delivered, five of the remaining ships then under construction, and such additional ships as under the plan provided might be necessary to fund the indebtedness of the shipbuilding corporation to the Fleet Corporation; that for each ship the shipbuilding corporation should pay $2,115,000, one-fourth cash and the balance in notes running over a period of five years and secured by purchase-money mortgage on the ship; that the earnings of the ships already delivered less expenses should be credited on the initial payments, and that initial payments as they were made should be loaned to the shipbuilding corporation to enable it to continue construction; that, upon the completion of the eighth ship, or such number of ships as might be necessary to work out the

indebtedness of the shipbuilding corporation, a final adjustment should be made and payment or mortgage should be made only for such sum as might be necessary to reimburse the Fleet Corporation for the balance due it; and that thereupon the Fleet Corporation should convey to the shipbuilding corporation all unfinished ships and ship materials within its yards, and release the mortgage on its plant, and that the parties should execute to each other full releases covering all claims of every sort whatever.

That this is a correct analysis of what we deem the pertinent provisions of the contract is admitted by the Virginia Shipbuilding Corporation in the ninety-second paragraph of its answer, from which we quote the following averments:

"That the purport and intent of the said contract to purchase was that upon payment to the United States of America, the complainant herein, represented by the United States Shipping Board, of an amount equaling the total payments on account of construction theretofore paid by the defendant, United States Shipping Board Emergency Fleet Corporation, the said payments to include moneys paid on account of construction and loaned, and interest at the rate of 5 per cent. upon all of such payments and a reasonable portion of the overhead of the United States Shipping Board Emergency Fleet Corporation, this answering defendant should become the owner of all of the vessels which it had constructed and was constructing, and that, in order to enable this answering defendant to make the said payments, the said vessels which had been theretofore completed and delivered pursuant to the contract, Exhibit C, should be redelivered to this answering defendant and the other vessels as they were completed and accepted by the defendant, United States Shipping Board Emergency Fleet Corporation, should be immediately redelivered to this answering defendant, so that the same might be operated and the revenues received from the operation be used in such manner as would permit the consummation and conclusion of the executory contract to purchase said vessels. That the said provision fixing a price of $2,115,-000 for each of said vessels was inserted in said contract solely for the purpose of calculating the initial payment to be made on account of the said vessels and the amount of mortgage to be given to secure deferred payments."

Of significance, also, as bearing upon the interpretation of the contract, is a letter written by one Thurlow M. Gordon for the ship-building corporation to the chairman of the Shipping Board, on September 10, 1919, suggesting a provision which was substantially inserted in the contract as the last paragraph of article VII. This letter contained the following statement:

"Since seeing Mr. Robinson and Mr. Hyman it has been brought to my attention that *in clothing the reimbursement in the language of a sale*, we have omitted to state explicitly, as we should, that:

"'It is understood that the Virginia Shipbuilding Corporation shall not become obligated to pay more than the total amount expended by the Fleet Corporation in connection with this contract, including interest and overhead, as herein provided, and the last mortgage given shall be adjusted accordingly so that it shall not exceed the amount of said expenditures not then repaid to the Fleet Corporation or secured by previous mortgages on ships.'" (Italics ours.)

On December 30, 1919, shortly after the execution of this contract, the shipbuilding corporation transferred to C. W. Morse & Co. its rights in the ships which it was to acquire under the contract. And on January 19, 1920, C. W. Morse & Co. transferred its rights in the ships to the United States Transport Company, a corporation which it organized for the purpose, receiving in payment therefor a large block of the transport company's stock. In this connection it appears that C. W. Morse & Co. controlled the United States Steamship Company, which in turn controlled both the Virginia Shipbuilding Corporation and the Groton Iron Works.

Pursuant to the terms of the contract of September 25, 1919, the Shipping Board and the Fleet Corporation delivered to the shipbuilding corporation the three vessels which had been completed prior to its execution, namely, the Vanada, the Guston Hall, and the Betsy Bell, and thereafter, and prior to July 19, 1920, delivered five additional vessels as they were completed. Bills of sale were executed covering two of the vessels, viz., the Vanada and the H. F. Morse, and purchase-money notes and mortgages were executed pursuant to the contract. Bills of sale, notes, and mortgages were not executed covering the six other vessels. The ship-building corporation paid on the purchase price of the eight vessels delivered to it the sum of $2,341,024.94, representing the initial payments on three of the vessels and part payment on the others. The Fleet Corporation, however, made additional advancements to the shipbuilding corporation in sums exceeding this amount plus the earn-

ings of the Guston Hall and the Betsy Bell.

Beginning in December, 1919, the shipbuilding corporation made repeated requests of the Shipping Board for modifications of the contract of September 25, 1919. Among other things, it sought to be relieved from making the initial payments on the vessels delivered, on the ground that under the contract these payments were to be advanced to it to finish the work on the uncompleted vessels. It asked that its plant be released from the mortgages or deeds of trust which the Fleet Corporation held to secure the indebtedness due it, in order that it might raise funds by a bond issue on its plant to enable it to complete the vessels under construction. And it requested also that the deferred payments on the vessels be extended over a period of twelve years instead of over a five-year period as provided in the contract. While these requests were being urged, the Fleet Corporation had entered into a contract with the Groton Iron Works for the completion of certain ships, and the Fleet Corporation desired that the performance of this contract be guaranteed by the shipbuilding corporation, whose stock was owned by the same corporation that owned the stock of the Groton Iron Works. Accordingly, negotiations were commenced looking toward a modification of the contract of September 25, 1919, and the guaranty by the shipbuilding corporation of the iron works contract. On April 30, 1920, the Shipping Board passed a set of resolutions which provided, in substance, that, in consideration of the shipbuilding corporation guaranteeing the performance of the Iron Works contract, the deeds of trust on the plant of that corporation would be released by the trustees named in the deeds of trust, and that the shipbuilding corporation might execute a deed of trust on its plant to secure a $2,000,000 issue of bonds to be disposed of for the purpose of obtaining funds to be applied in fulfilling its contract of September 25, 1919. These resolutions further provided that the shipbuilding corporation should agree that the title to hulls 1, 2, 5, 6, 7, 8, 9, and 10, and all excess material in its yard, should remain in the United States until the final statement of account between the parties, that title to hulls 3 and 4, the Vanada and the H. F. Morse, should be reconveyed to the United States, and that the shipbuilding corporation should agree to transfer all of its interest in these vessels to a corporation to be organized in accordance with the directions of the Shipping Board, and should enter into an agreement "for the payment of the outstanding amounts of the purchase price thereof" in accordance with such policy and terms as should be adopted by the Shipping Board.

Pursuant to these resolutions of the Shipping Board, a formal written contract was entered into on July 19, 1920, between the shipbuilding corporation on the one hand and the Fleet Corporation and the Shipping Board on the other, which, after reciting the execution of the supplemental contract of September 25, 1919, the completion and delivery of ships thereunder, the request for the release of the deeds of trust, and the contract of the Groton Iron Works, contained provisions for the release of the deeds of trust on the plant of the shipbuilding corporation, for the placing of a deed of trust on that property to secure a bond issue of $2,000,000, for use of the proceeds of the bonds by the shipbuilding corporation in liquidating its obligations under the contract of September 25, 1919, in carrying on work of construction thereunder or in liquidating plant obligations, and for guaranteeing the performance of the contract of the Groton Iron Works. The provisions of that contract which are pertinent to the controversy here (the shipbuilding corporation being therein referred to as the company) are as follows:

"Now, therefore, in consideration of the premises and of the mutual covenants and premises hereinafter contained, and more particularly in consideration of the release of those certain deeds of trust specifically set forth in paragraph six hereof, it is agreed as follows:

"1. That the company shall, within 30 days from the date hereof, reconvey, or cause to be reconveyed, to the United States of America, represented by the Shipping Board, hulls 3 and 4, namely, the Vanada and H. F. Morse.

"That title to hulls 1, 2, 5, 6, 7, 8, 9, and 10 are hereby transferred and conveyed to the United States of America.

"That on and after the completion of the present voyages of hulls 1 to 7, inclusive, namely, the Vanada, Gunston Hall, Betsy Bell, H. F. Morse, E. A. Morse, Clemence C. Morse, and Jennie R. Morse, the company shall account for, or cause to be accounted for, the revenues of said vessel in the manner provided for under the present form of agency agreement for the operation and management of steel vessels now in use by the Fleet Corporation, a copy of which is attached hereto and made a part hereof. The same procedure shall be followed as to all the vessels hereafter delivered to the com-

pany under the terms of this agreement and under the terms of said agreement of September 25, 1919.

"It is expressly agreed that the company may use the net operating revenues derived from the operation of hulls 1 to 7 and the hulls hereafter delivered for the purpose of financing the construction of hulls 8 to 10, inclusive, now under construction at the company's yard at Alexandria, Va. Such funds shall be disbursed by the treasurer of the Fleet Corporation through controlled account as at present.

\*    \*    \*    \*    \*

"4. That upon the completion of hulls 8, 9, and 10 and the final statement of account between the Fleet Corporation, the company, and the Groton Iron Works, the company hereby consents to the Shipping Board transferring the company's equity in hulls, 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 to a corporation nominated by the company in accordance with the directions of the United States Shipping Board, title to said vessels to be deemed effective as of the original dates of delivery thereof to the company, which said corporation shall be limited to the operation of said vessels, and that said corporation shall enter a contract with the Shipping Board for the payment of the amounts outstanding on the purchase price of said vessels, said contract to be in accordance with such standard policy and terms as shall be adopted by the Shipping Board for the sale of steel vessels.

"5. That the company will complete hulls 8, 9, and 10 at its own risk and its own expenses.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"9. Without being limited to the following incidents, default shall exist on the occurrence of any one of the following contingencies:

"(a) Failure to complete hulls 1–10, inclusive, as provided for in contract 145–SC as modified by supplemental agreement of September 25, 1919.

"(b) The abandonment by the company of either of said contracts or the failure by it to perform any of the duties of obligations imposed by either of said contracts.

"(c) The adjudication of the company as a bankrupt or insolvent, or the appointment of a receiver of all or any part of its property after full hearing, with proper notice, in a court of competent jurisdiction.

"(d) The misapplication or diversion of the funds derived from the sale of said bond issue.

"(e) Any other act on the part of the company prejudicial to the rights and/or interest of the United States of America, the United States Shipping Board and the United States Shipping Board Emergency Fleet Corporation, if so determined by a court of competent jurisdiction.

"That upon the happening of any act of default or in the event the company shall default in any of the terms of the contract 145–SC, as modified by contract of September 25, 1919, or of this agreement, the Fleet Corporation shall have the right to enter the yard of the company and to complete the vessels remaining under construction in such manner as it may deem to its best advantage, and may retain title to so many of the said vessels and to so much of said surplus material in the yard of the company as may be necessary to offset the total indebtedness of the company to the Fleet Corporation, including all the obligations of the company to the Fleet Corporation under said contract of September 25, 1919, and under this contract."

"11. This agreement is supplemental to contract 145–SC and supplemental contract thereto of September 25, 1919, and where inconsistent therewith shall be held to govern. Except as herein otherwise provided, the provisions of this contract shall remain in full force and effect."

As stated, eight of the vessels had been completed prior to the execution of the contract of July 19, 1920. Three of them were delivered to the United States Transport Company shortly after the execution of the contract of September 25, 1919, and the others as they were completed, the ninth being delivered November 1, 1920. After delivery they were operated by the transport company until seized by the government. They were operated after the execution of the contract of July 19, 1920, under agency agreements, but the transport company insisted that the fact that they were not ordinary government vessels operated under agency agreements be noted on the delivery certificates, and this was agreed to by the Shipping Board. As showing the interpretation which the parties placed upon the contracts in question, the correspondence relative to this matter is pertinent. On August 25, 1920, the transport company wrote the Shipping Board relative to the Gunston Hall as follows:

"The allocation of this vessel should be to the United States Transport Company, Inc., for operation pending purchase, and should recite that the allocation is in pursuance of contract between the Emergency

Fleet Corporation and the Virginia Shipbuilding Corporation.

"We do not want you to feel that we are unduly hesitating to sign the management and operation certificates, but with the contract relations which we have made with the Fleet Corporation at the Washington office, we do not feel that the papers sent to us properly describe the allocation to us."

The manager of the Contract Bureau of the Shipping Board replied to this letter as follows:

"Your letter of August 25th to the Division of Operations at Baltimore, Md., has been referred to this Bureau, and we beg to advise that it will be in order for you to make notation on delivery certificates which have been sent you to show that this vessel was delivered to you for management and operation in accordance with agreement dated July 19, 1920, between the Emergency Fleet Corporation and the Virginia Shipbuilding Corporation."

On September 9, 1920, the transport company replied as follows:

"Inasmuch as the certificates run to the United States Transport Import & Export Company, instead of to this company we are returning same to you with the suggestion that you have them made out to this company and insert 'pending purchase' after the words 'for operation,' and at the end the following statement: 'Delivery of this vessel is in pursuance of contracts between the United States Shipping Board, Emergency Fleet Corporation, and the Virginia Shipbuilding Corporation.' The same notation should be made on the management certificates."

In delivering bills of sale for the Vanada and the H. F. Morse, pursuant to the contract of July 19, 1920, the transport company wrote two letters to the Shipping Board, each of which contained the following paragraph:

"In making this delivery it is, of course, with the understanding that the vessel is to be operated by us pending the delivery of a contract of purchase in the new form, and the subsequent bill of sale, which are to be delivered as soon as the adjustment of the Virginia Shipbuilding Corporation's accounts with the Fleet Corporation can be accomplished."

On September 29, 1920, the transport company, in requesting that the Betsy Bell be sent to Alexandria, Va., for repairs, wrote the Shipping Baord as follows:

"We make this request feeling that this company has a large equity in this vessel as well as the other nine steamers which have been, or are being, constructed at the Virginia Shipbuilding Company, and for the further reason that the vessel is now under contract of sale to said corporation, consummation of this sale depending only upon the completion of the last vessel now at the plant."

And on November 3, 1920, in a letter regarding the same subject, it said:

"Our investment in each of these Virginia ships is large and we naturally feel entitled to the ownership and operation of these boats."

From the time that the vessels were delivered to it until they were seized by the government, the transport company received and retained their entire operating revenues, and in a letter of March 21, 1921, to counsel of the Shipping Board the assistant manager of the Transport Company said:

"Permit us to call your attention to the real provisions of the contract of July 19th, namely, that the vessels therein mentioned are sold to the Virginia Shipbuilding Corporation, and that after the completion of the voyages which the vessels were on at the time of the making of that contract the company shall account for and cause to be accounted for the revenues of said vessels in the manner provided for under the present form of agency agreement.

"Such accounting is being made. The United States Shipping Board Emergency Fleet Corporation has contended that that places the vessels under the usual form of managing and agency agreement but a careful reading of the contract clearly shows that such is not the case.

"On the contrary, the vessels were sold without reservation as to operation and management, merely the reservation that the company should account for the revenue. This question has been presented in the litigation now pending between the Virginia Shipbuilding Corporation and the United States Shipping Board Emergency Fleet Corporation and our contention sustained."

The statement as to the sustaining of the Transport Company's contention had reference to a temporary injunction granted by Judge Waddill on February 5, 1921, in the case instituted by the Virginia Shipbuilding Corporation, restraining the Fleet Corporation from interfering with the operation of the vessels then in the possession of the transport company in the coastwise trade. This injunction was granted upon the filing by the shipbuilding corporation of an amended bill of complaint in which that corporation alleged, among other things, that the vessels

had been delivered to the transport company at the direction of the shipbuilding corporation, in accordance with the contract of September 25, 1919, whereby the Fleet Corporation agreed to sell and the shipbuilding corporation agreed to purchase the ships; that under the contract of July 19, 1920, the shipbuilding corporation had nominated and designated the transport company as the corporation to which the vessels should be delivered, and that, in accordance with this designation, the Fleet Corporation had "delivered each of said completed vessels to said United States Transport Company, Inc., in pursuance of said contracts of purchase between the said defendant and your complainant pending purchase."

The vessels were seized by officers of the government, upon orders of the Shipping Board, in order that the interests of the government in the vessels might be protected against maritime liens which had been allowed to accumulate against them and also that the rights of the government under the contract which had been breached by the shipbuilding corporation might be protected. The Betsy Bell was seized September 10, 1920, and during the same month the Shipping Board ordered the seizure of the H. F. Morse, the Vanada and the Gunston Hall because of the liens which had been allowed to accumulate against them. None of the three last named were seized, however, until the seizure of the Gunston Hall on January 25, 1921, and of the H. F. Morse on March 5, 1921. At the time of ordering the seizure of these vessels the Shipping Board did so only upon condition that the shipbuilding corporation or the transport company should fail to reimburse the Fleet Corporation for expenditures made in the liquidation of liens and for repairs and expenses incurred in returning the vessels to port; and, at the time of the seizure of the Vanada, counsel for the Shipping Board wrote to the transport company that the vessel would be released if the Fleet Corporation were reimbursed for these expenditures.

Neither the shipbuilding corporation nor the transport company reimbursed the Fleet Corporation for the expenditures made, and in the spring of 1921 the shipbuilding corporation was in default under its contract in other respects. It had abandoned work on hull No. 10. It had used the $2,000,000 of bonds secured by a mortgage on its plant for other purposes than those authorized in the contract of July 19, 1920, and it had allowed maritime liens aggregating large amounts to accumulate against the vessels operated by the transport company. On April 15, 1921, the Assistant Counsel of the Shipping Board reported these facts to the Board, together with a statement that the shipbuilding corporation was practically bankrupt and was operating the vessels in such manner as to incur large liabilities, which sooner or later would have to be paid by the Shipping Board to protect the interest of the government in the vessels. The Shipping Board thereupon directed the seizure of the remainder of the vessels, and they were seized May 6 and 7, 1921. Judge Waddill has found that the market value of the ten vessels on the dates of their respective seizures was $5,235,000, reversing a finding of the master that their value was $185 per dead weight ton, or a total of $17,390,000.

The shipbuilding corporation filed suit on December 11, 1920, against the Fleet Corporation and the Groton Iron Works for an accounting under the contracts of December 7, 1917, September 25, 1919, and July 19, 1920, and for specific performance of the agreement to convey the vessels contained in the contracts. On November 15, 1921, after the seizure of the vessels, the United States instituted suit against the shipbuilding corporation, the Transport Company, the United States Steamship Company, C. W. Morse & Co., the Fleet Corporation, and the Shipping Board, to foreclose its lien or mortgage upon the vessels and to secure an accounting from the shipbuilding corporation and the transport company for the amounts due the United States. These two suits were consolidated in the District Court and an order was entered decreeing foreclosure and referring the cause to a master for an accounting. The vessels were sold under the decree of foreclosure in the year 1923, and were bought by the United States for the sum of $622,291.71. Upon the accounting had, the court found that the shipbuilding corporation was indebted to the United States in the sum of $21,060,290.74, and that, after crediting that corporation with the amounts to which it was entitled, including the value of the ships at the time of seizure, instead of merely with the amount realized upon sale under foreclosure, there remained a balance due the United States of $11,571,858.05, for the recovery of which decree was entered in favor of the United States. This amount included disbursements and expenses incurred in removing maritime liens from the vessels and bringing them into port and caring for them, amounting with interest to $580,375.18, for which amount a recovery was granted against the United States Transport Company also.

From the decree entered, only the Virginia Shipbuilding Corporation and its trustee in bankruptcy have appealed.

Wm. A. Barber, of New York City, Wm. L. Day, of Cleveland, Ohio, J. K. M. Norton, of Alexandria, Va., and H. Starr Giddings, of New York City (James R. Caton, of Alexandria, Va., Wolcott, Wolcott & Lankford, of Norfolk, Va., and Carlin, Carlin & Hall, of Alexandria, Va., on the brief), for appellants.

Chauncey G. Parker, of Newark, N. J., and W. W. Nottingham, of Washington, D. C. (Paul W. Kear, U. S. Atty., and H. H. Rumble, both of Norfolk, Va., on the brief), for the United States.

Before PARKER and NORTHCOTT, Circuit Judges, and SOPER, District Judge.

PARKER, Circuit Judge (after stating the facts as above). The questions presented by this appeal relate solely to the credits to which the shipbuilding corporation is entitled in connection with the ships constructed by it under its various contracts with the Fleet Corporation and the Shipping Board representing the government; for there is no dispute as to the amount of the loans and advancements made to the shipbuilding corporation or as to its liability therefor. The first position of the shipbuilding corporation is that it is entitled to credit for the amount which was to be paid under the contract of December 7, 1917, for the construction of the vessels in controversy, and that this credit will extinguish its indebtedness to the government and will moreover entitle it to recover a considerable balance. Its second position is that, even though it be not entitled to recover for the construction of the vessels under the contract of December 7, 1917, it is entitled to credit for their value at the time they were seized by the government; that their value at that time was as much as $185 per dead weight ton; and that to charge the government with this value would entirely extinguish its claim and entitle the shipbuilding corporation to a decree for a balance amounting to $2,572,955.12.

[1] With respect to its first position, the shipbuilding corporation contends that it did not purchase from the government the ten ships which were sold under foreclosure; that only two of these ships were ever conveyed to it, and that these were conveyed back to the government pursuant to the contract of July 19, 1920; that at the time the ships were seized by the Shipping Board there existed merely an executory contract to sell them to the shipbuilding corporation or its nominee; and that the seizure of the ships by the government constituted an abandonment or rescission of the executory contract to sell, and relegated the parties to their rights under the original construction contract. The contention of the government is that its obligation to pay for the construction of the vessels was modified and superseded by the contract of September 25, 1919; that the purpose and effect of that contract was to release the government from its obligation to take and pay for the vessels under the construction contract and to provide for the reimbursement of the government for the moneys which it had advanced; that this reimbursement was to be accomplished by having the shipbuilding corporation complete and take over the vessels and execute mortgages upon them as security for the moneys which the government had advanced and which the shipbuilding corporation was bound to repay; that pending the completion of the vessels and the execution of these mortgages legal title was retained in the government as security for the amount due it with beneficial ownership of the vessels in the shipbuilding corporation; that the government, because it held the legal title to the vessels as security, was justified in seizing them for the protection of its interest, such seizure being also expressly authorized by the contract of July 19, 1920; and that in this suit it was proper to decree foreclosure of the equity of the shipbuilding corporation and, after applying the proceeds of the sale of the vessels in partial satisfaction of the debt due the government, to enter decree in favor of the government for the balance due it.

Intricate legal arguments have been advanced with great ingenuity of reasoning and wealth of learning in support of these conflicting contentions; but the answer to the questions involved is to be found, not in technical reasoning from legal definitions applied to the forms in which the parties have clothed their transactions, but in a careful study of the facts conducted with a view of ascertaining the real relationship which existed between the parties and the substance, not the form, of the agreements into which they entered. Such a study has convinced us that the position of the government is essentially correct.

There can be no dispute, of course, as to the meaning of the first contract, that of December 7, 1917. Under it the government was the absolute owner of ships constructed as well as ships in process of construction

and ship material on the yards of the shipbuilding corporation. It made loans and advancements for which the shipbuilding corporation became indebted to it, and upon the completion of the ships it was to pay the price provided in the contract.

The meaning of the contract of September 25, 1919, is, we think, equally clear, although "in clothing the reimbursement in th language of a sale" (to quote the letter of September 10, 1919), some ground was given for technical argument. The war was over and the government did not need the vessels which it had contracted with the shipbuilding corporation to construct. There was a large demand for such vessels, however, and the shipbuilding corporation itself, or those who controlled it, thought it could use to advantage the vessels embraced in the contract. The government, however, had advanced for the construction of these vessels over $12,000,000 for which it would have to be reimbursed if the vessels were to be taken over by the shipbuilding corporation. To meet this situation, the contract of September 25, 1919, was executed. Its purpose, as appears from the contract itself as well as from the letter of the shipbuilding corporation, was to let that corporation take over the ships and reimburse the government by giving it notes secured by mortgages on the ships taken over. Initial payments were to be made, but these were to be returned to the shipbuilding corporation to enable it to complete the ships under construction. A price was fixed for the ships, which the shipbuilding corporation says was merely to determine the amount of the initial payments; and it is clear that under the plan adopted the higher the price fixed the fewer ships would be subject to mortgage. As soon as the notes and mortgages given together with the initial payments provided for should equal the amount due the government, all parties were to be absolved from further liability under the contracts, and all ships and ship material were to be conveyed to the shipbuilding corporation. Until the initial payments were made and the mortgages given, the title to ships completed and under construction and to shipbuilding material on the ground remained in the government under the provisions of the contract of December 7, 1917; but this title of the government was subject to the right of the shipbuilding corporation to proceed with the completion of the ships, all of which remained in its possession, and to have title thereto placed in its name upon making the payments, which were to be loaned back to it, and executing the mortgages provided for.

When we come to the dealings of the parties under the contract, we find that from the time of its execution the shipbuilding corporation conducted itself and was treated by the government as the beneficial owner of the vessels. Of course, the shipbuilding corporation had possession of the uncompleted ships and the ship material at the time of the execution of the contract, but, as soon as the contract was executed, the three completed ships were delivered back to it, although initial payments and mortgages were delivered as to only two of them. It was at once credited with the earnings of the two ships which had been under commitments. And six other ships were delivered as fast as they were completed, although the initial payments required by the contract were not made, nor were mortgages delivered as to any of them. All of these vessels were thereupon operated and continued to be operated by the transferee of the shipbuilding corporation until they were seized by the government.

Construing the contract of September 25, 1919, therefore, in the light of the purpose for which it was executed and the practical interpretation placed upon it by the parties themselves, we think there can be no doubt that it was intended to be and was a contract under which the ships completed and under construction were taken over by the shipbuilding corporation, with provision for completion of ships and execution of mortgages in reimbursement of the government for moneys advanced, and with title remaining in the government as security until the contract should be carried out. We think it is clear, and this is the vital point in the case, that, after the execution of this contract the government was no longer under obligation to take and pay for ships constructed under the contract of December 7, 1917, but became, in effect, a mere creditor, holding title to ships and ship materials as security for the money which it had advanced to the shipbuilding corporation, and bound to surrender its rights in the ships and ship material when the indebtedness due it should be repaid or funded in accordance with the provisions of the contract. See Heryford v. Davis, 102 U. S. 235, 26 L. Ed. 160; U. S. v. Shelby Iron Co., 273 U. S. 571, 47 S. Ct. 515, 71 L. Ed. 781.

[2] And we do not think that the essential relationship created between the parties by the contract of September 25, 1919, was changed in any vital particular by the contract of July 19, 1920. Considering the situation which existed when that contract was executed, it appears that legal title to two of

the vessels had been conveyed to the .shipbuilding corporation. The initial payments on these had been made, but the amounts so paid had been advanced back to the shipbuilding corporation. The government thus held mortgages on them, in an amount less by about $1,000,000 than their supposed value. The shipbuilding corporation was seeking release of the mortgages on its plant, and the government was seeking a guaranty of performance of the Groton Iron Works contract. In addition to this, the shipbuilding corporation was seeking to be relieved from making initial payments on the ships delivered and to obtain a longer term for the purchase-money mortgages to run, in accordance with terms granted other purchasers of ships. All of these matters were covered by the contract of July 19, 1920. Provision was made for the release of the mortgage on the plant and for the guarantee of the Groton Iron Works contract. Evidently to secure the indebtedness from which the security of the plant mortgage was withdrawn and which might be increased by the guaranty of the Groton Iron Works contract, title to all of the vessels constructed and under construction was conveyed to the government, and provision was made for their revenues being handled under a controlled account for the completion of construction. Initial payments were dispensed with, although the corporation was to be allowed to operate the completed vessels. And upon completion of all of the vessels the equity in them owned by the shipbuilding corporation was to be transferred to a corporation to be named by it, under a contract to be drawn in accordance with the standard policy and terms adopted by the Shipping Board.

It will thus be seen that there is nothing whatever in the contract of July 19, 1920, which obligates the government to take and pay for the vessels in accordance with the contract of December 7, 1917, or which releases the shipbuilding corporation from its obligation to take and pay for them under the contract of September 25, 1919. On the contrary, the rights and obligations of the shipbuilding corporation under that contract are expressly recognized. In providing for the transfer of the vessels to the nominee of the shipbuilding corporation upon their completion, it is that corporation's "equity" in them which is to be transferred. The proceeds of the $2,000,000 bond issue are to be applied by the shipbuilding corporation in "liquidating its obligations under the contract of September 25, 1919." And in event of default by the shipbuilding corporation, the Fleet Corporation is to retain title only "to so many of the said vessels and to so much of the surplus material in the yard of the company as may be necessary to offset the total indebtedness of the company to the Fleet Corporation, including all the obligations of the company to the Fleet Corporation under said contract of September 25, 1919, and under this contract." It is true that the revenues of the vessels are to be accounted for in the manner provided under the agency agreement in use by the Fleet Corporation, but these revenues are to be used for financing the construction of the uncompleted vessels, and, upon the transfer of the vessels to the nominee of the shipbuilding corporation, title is to be deemed effective "as of the original dates of delivery thereof to the company." In other words, under the contract of July 19, 1920, the shipbuilding corporation still had an equity in the vessels and was still under obligation to take and pay for them with notes and mortgages in reimbursement of the amount which had been advanced by the government; and the government remained a mere creditor, holding the legal title to the vessels and material as security for the amount which it had advanced. By the contract of September 25, 1919, the shipbuilding corporation assumed the obligation of taking over the vessels and reimbursing the government for the moneys which it had advanced. Certainly the contract of July 19, 1920, expressly stated to be supplemental to the contract of 1919, cannot and does not relieve the shipbuilding corporation of this obligation.

[3] And we do not think that the seizure of the vessels by the government can be considered in any sense an abandonment or rescission of the contracts of September 25, 1919, and July 19, 1920. It is true that the former of these contracts, provided in article 9 thereof that, upon failure of the shipbuilding corporation to fulfill its obligations, the Fleet Corporation might declare the contract forfeited and the original contracts reinstated in full force and effect, upon giving fifteen days' notice. But there is no evidence whatever that the Fleet Corporation or the Shipping Board or any one representing the government ever gave any notice of forfeiture or that it attempted to declare the contract of September 26, 1919, forfeited or to reinstate the original contract. The seizure of the ships and ship materials was made under section 9 of the contract of July 19, 1920, which authorized the Fleet Corporation, upon default by the shipbuilding corporation, to enter its yard and com-

plete construction and to retain title to so many of the vessels and so much of the material as might be necessary to offset its indebtedness. And not only do we think that the seizure of the vessels did not of itself operate as an abandonment or rescission of the contracts of September 25, 1919, and July 19, 1920, but we think, also, that the evidence conclusively shows that no abandonment or rescission was intended or understood by either party to have been effected. When the Betsy Bell was seized and the seizure of three of the other vessels was authorized, the Shipping Board directed that they remain in the custody of the Fleet Corporation and be allocated or assigned by it, only upon the condition that the shipbuilding corporation or the transport company should fail to reimburse the Fleet Corporation for the amount expended in releasing liens and bringing the vessels into port. More than a month after this, the ninth vessel was delivered to and accepted by the transport company and more than three months later the shipbuilding corporation applied for and obtained a temporary injunction restraining the Fleet Corporation from interfering with the transport company in operating the vessels in its possession in the coastwise trade. In applying for this injunction, the shipbuilding corporation relied upon its rights in the vessels under the contracts of September 25, 1919, and July 19, 1920, although seizure of two of the vessels had been made at that time. On February 7, 1921, after the seizure of the Guntson Hall, the transport company wrote a letter protesting against the seizure, and stating that that vessel was delivered "pursuant to a contract of purchase," and that the action of the Shipping Board constituted a conversion of the vessel for which it would be held for damages. On March 21, 1921, after three of the vessels had been seized, the assistant manager of the transport company wrote the letter from which we have quoted in the statement of facts, in which he relied upon these contracts for the position that the vessels in the possession of the transport company were not subject to the management and control of the Shipping Board but only an accounting of their revenues was required. And on June 15, 1921, after all the vessels had been seized, counsel for the transport company wrote the Fleet Corporation, refusing to sign delivery certificates for the vessels seized and protesting that they were seized improperly. In view of these and other circumstances, the narration of which would unduly lengthen this opinion, we are satisfied that the government did not intend to rescind or abandon the contracts of Sep-

tember 25, 1919, and July 19, 1920, and go back to the original construction contract, and we are satisfied also that the shipbuilding corporation and the transport company thoroughly understood this, and that, while they protested against the seizure of the ships, they did not themselves attempt to rescind the contracts of purchase because of their seizure, but, on the contrary, manifested an unequivocal intention to hold under the contracts.

Since, therefore, the effect of the contract of September 25, 1919, was to relieve the government of its obligation to take and pay for the vessels embraced in the construction contract, substituting therefor an agreement under which the government was to be reimbursed for loans and advancements and hold legal title to the ships and ship materials as security until the agreement was carried out, and since the essential nature of this agreement was not changed by the contract of July 19, 1920, and has not since been abandoned or rescinded, it follows that there was no basis for going back to the construction contract of December 7, 1917, or for charging the government with the price of the ships in accordance with its terms.

[4, 5] It is said, however, that the contract under which the shipbuilding corporation was to take over the vessels was an executory contract of sale, and that, as the government never delivered bills of sale conveying the title to the ships to that corporation or its nominee, it cannot rely upon that contract as absolving it from liability to take and pay for the ships. But, as we have seen, the contract was not a mere executory contract of sale. It was a contract for reimbursement under which the ships were to be taken over by the shipbuilding corporation and mortgages executed thereon in liquidation of the debt due the government. This vested in the corporation a substantial equity in the ships, subject to the legal title which was retained in the government as security for the debt due it. This being the situation, it is clear that the shipbuilding corporation is not to be relieved of its obligation and the parties thrown back upon the original construction contract merely because legal title has not been conveyed to the shipbuilding corporation, when it appears that legal title has not been conveyed because the shipbuilding corporation has not complied with the conditions entitling it to a conveyance. Williston on Contracts, vol. 2, § 677; U. S. v. Peck, 102 U. S. 64, 6 L. Ed. 46; U. S. v. United Engineering Co., 234 U. S. 236, 34 S. Ct. 843, 58 L. Ed. 1294. On the contrary, equity, at the instance of the party ag-

grieved, will regard that as done which should have been done, will treat the ships as the property of the shipbuilding corporation with legal title in the government to secure the indebtedness due it, and will decree foreclosure in order that the proceeds of the ships may be applied upon the debt.

[6] We do not find in the books any case exactly similar to the case at bar; but we find many cases which apply the equitable principles which are controlling here. Thus it is well settled that an express executory contract in writing, whereby a party promises to convey, assign, or transfer property as security for a debt or other obligation, creates an equitable lien upon the property, under the maximum that equity regards as done that which ought to be done. Pomeroy's Equity Jurisprudence, vol. 3, § 1235; Ingersoll v. Coram, 211 U. S. 335, 368, 29 S. Ct. 92, 53 L. Ed. 208; Walker v. Brown, 165 U. S. 654, 664, 17 S. Ct. 453, 41 L. Ed. 865; Ketchum v. St. Louis, 101 U. S. 306, 316, 25 L. Ed. 999. In this case, therefore, the agreement to execute mortgages upon the ships delivered to the shipbuilding corporation would have given rise to a lien which a court of equity would have enforced even had the title not been retained as security. Certainly the government is not to be held to be in a worse position because the legal title has been retained pending the completion of construction and the execution of bills of sale and mortgages in accordance with the contract.

[7, 8] It is also well settled that, in the application of the equitable maxim above stated, a court of equity will deal with even an executory contract for the sale of land or chattels in a very different manner from a court of law, and, in a proper case, will regard the purchaser as the real owner of the property subject to liability for the unpaid price, and the vendor or seller as holding the legal title merely as security. Pomeroy's Equity Jurisprudence, vol. 1, § 368; Rexford v. Southern Woodland Co. (C. C. A. 4th) 225 F. 1022; s. c. (D. C.) 208 F. 295; Lewis v. Hawkins, 23 Wall. 119, 23 L. Ed. 113. This will be done, of course, only in those cases where equity will decree specific performance of a contract, and is, in reality, an exercise of the power to compel specific performance in order that more perfect and complete justice may be done. See opinion of Judge Connor in Rexford v. Southern Woodland Co., supra (D. C.) 208 F. at 306. And, although ordinarily specific performance will not be decreed of a contract for the sale of chattels, relief is denied in such cases solely because the remedy at law is deemed

adequate. Where the remedy at law is inadequate, specific performance will be decreed, and such relief has been granted with respect to a contract for the sale of vessels. Clark v. Flint, 22 Pick. (Mass.) 231, 33 Am. Dec. 733; 25 R. C. L. 295. The peculiar circumstances of this case—the fact that the ships to be conveyed were being constructed by the shipbuilding corporation and were left in its possession; that the conveyance was to be in satisfaction of existing controversies; that the price agreed was merely a basis for determining the first payments and the amount of the mortgages to be given for funding the existing indebtedness; and that the mortgages were to be executed, not in reality for the purchase price at all, but as a means of funding the indebtedness—all of these make the case one where the remedy at law would not meet the situation and where the remedies which only equity can administer are peculiarly appropriate. We think, therefore, that the learned Judge in the court below was correct in holding that the equitable ownership of the vessels was in the shipbuilding corporation, or its transferee, the transport company, with legal title in the United States as security for the amount due, even though the bills of sale for the vessels and the mortgages back had not been executed; and that he properly entered the decree of foreclosure under which the vessels were sold, as there can be no controversy as to the fact that the shipbuilding corporation and the transport company were in default at the time.

And we do not think that this decision conflicts with what was decided by the Circuit Court of Appeals of the Third Circuit in U. S. v. Henderson, 286 F. 794. That was a suit against the United States under the Suits in Admiralty Act (46 USCA §§ 741–752 [Comp. St. §§ 1251¼–1251¼l]) to recover for supplies furnished to some of the vessels involved in this suit while they were being operated by the transport company. The United States appeared as the registered owner of the vessels, but the defense was made that the transport company was operating them, not for the United States, but for the shipbuilding corporation. In holding the government liable, the court was careful to state that the case before it was not an action between the United States and the shipbuilding corporation or the transport company arising out of the contracts between them, but that it had been instituted by strangers who were wholly uninformed at the time of furnishing the supplies as to the situation existing between the parties. The court pointed out that the statute (Act of June 23, 1910, 36 Stat. 604 [Comp. St. §§

7783–7787], as re-enacted in the Merchant Marine Act of June 5, 1920, 41 Stat. 988 [46 USCA §§ 971–975; Comp. St. §§ 8146¼ooo–8146¼q]), upon which libelants relied, presumes the owner's authority in one intrusted with a ship to procure supplies on the pledge of the ship, unless the owner has withheld his authority and the furnisher knows this or by due diligence could have ascertained it; that there was nothing in the agency agreement under which the transport company was operating the vessel which restricted its authority to secure supplies on the credit of the vessel; and that the restriction in the standard form of purchase agreement which was to be executed when the vessel was transferred pursuant to the contract of July 19, 1920, was not applicable because the vessel had not been transferred nor the purchase agreement executed. The decision, in short, was based on the fact that there was nothing in the completed transactions between the government and the shipbuilding corporation or the transport company which withheld from the transport company the right to purchase supplies on the credit of the vessels. While the contract of July 19, 1920, was referred to as an executory contract to sell, this expression must be construed in the light of the question before the court. The court in that case did not have occasion to consider the effect of the contracts of September 25, 1919, and July 19, 1920, on the obligation of the United States to take and pay for vessels under the original construction contract, nor the nature of the equity in the vessels acquired by the shipbuilding corporation under the later contracts, nor the rights of the parties under the later contracts on default by the shipbuilding corporation, which are the vital matters in the case at bar. In short, the court did not decide that the provisions of the contracts of September 25, 1919, and July 19, 1920, had been nullified by the acts of the parties, and that therefore their rights and liabilities should be determined by the original contract of 1917 for the construction of ships.

This brings us to the second question in the case. The shipbuilding corporation contends that there was unreasonable delay in making sale of the ships under foreclosure, and that it is entitled to credit for their value at the time of seizure, which it contends is $185 per dead weight ton, as found by the master to whom the case was referred. As heretofore stated, the vessels were seized in 1921 and were sold in 1923 for the sum of $622,291.71. Judge Waddill held that the shipbuilding corporation was entitled to credit for their value at the time of seizure, but found this value to be $5,235,000. The government has not appealed from this finding, but has consented that the shipbuilding corporation be credited with this amount. That corporation, however, contends for the credit of $185 per dead weight ton, which was allowed it by the master, and this would amount, with interest, to a sum exceeding $20,000,000.

[9] We have carefully considered the evidence bearing upon the value of the ships at the time of seizure, and we think that the finding of Judge Waddill with respect to this matter is correct and gives to the shipbuilding corporation all of the credit to which it is entitled under any aspect of the case. The finding of the master seems to have been based upon the asking price demanded by the Shipping Board for its vessels; but this asking price was far above their market value and seems not to have been reduced merely because the members of the Shipping Board thought they were without authority to act, due to the fact that the terms of a number of the members had expired and the Senate had failed to confirm the appointment of their successors. The finding of Judge Waddill, on the other hand, was based upon testimony as to market value which was practically uncontradicted. It is settled that we will not reverse a finding of the District Court having support in the evidence unless we think that the Judge has misapprehended the evidence or gone against the clear weight thereof, or, in other words, unless we think that his finding was clearly wrong. Wolf Mineral Process Corporation v. Minerals Separation North American Corporation (C. C. A.) 18 F.(2d) 483; International Organization, United Mine Workers of America, v. Red Jacket Coal & Coke Co. et al. (C. C. A.) 18 F.(2d) 839. But, without regard to this rule, we are satisfied that upon the evidence the finding made by Judge Waddill was correct.

[10] Because of the decline in the value of vessels between September, 1919, and May, 1921, a great loss was sustained in connection with the ships which are the subject-matter of the contracts under consideration. It is unfortunate that this loss must fall upon any one, but there would seem to be no question that in equity and good conscience, as well as in law, it should be borne by the shipbuilding corporation, who when times were prosperous and the contract seemed advantageous took over the government's interest in the vessels upon an agreement to repay merely the amount which had been advanced for their construction. The fact that prices

have since declined furnishes no excuse for releasing that corporation from its contract. As was well said by Judge Waddill in the court below ([D. C.] 292 F. 453):

"The fact that the Virginia Company and those acting with it were anxious to acquire the ships at the time they were purchased by them, and sold and transferred to C. W. Morse & Co., Inc., who in turn assigned them to the Transport Company, and now wish to be relieved from such ownership at a time when the ships have become almost worthless, and fall back to the former position of construction contractor under the first contract of December 7, 1917, instead of that of purchaser under the adjustment agreement, is only too apparent. To have the government make good to the Virginia company, and those claiming under it, the profits that would have been earned under the construction contract, and relieve them from their liability as purchasers, and return to them the advances made by the Virginia company on the purchase of ships, would be a most desirable position to occupy, but in its result would be very unfair to the government. If the Virginia company, C. W. Morse & Co., Inc., and the Transport Company, as to the purchase of the ships in question one from the other, are not estopped from now asserting that they are neither purchasers nor owners of the property, they should at least not be allowed to visit their losses upon the government, arising from what has developed to be an undesirable contract of purchase on their part.".

A motion to dismiss the appeal was made and argued at the same time as the case on the merits; but, as we have reached the conclusion that the decree should be affirmed on the merits, and as the result is the same so far as the parties are concerned, we deem it unnecessary to discuss the procedural questions raised by this motion.

The decree of the District Court is affirmed.

Affirmed.